2011 Ark. App. 276

**James C. JOHNSON, Appellant**

v.

**Norma JOHNSON, Appellee.**

No. CA 10–842.

Court of Appeals of Arkansas.

April 13, 2011.

Andrea Witcher Brock, Forrest City, for appellant.

Christopher Aaron Averitt, Jonesboro, for appellee.

DAVID M. GLOVER, Judge.

The distribution of the parties' property is at issue in this divorce case. Appellant James Johnson challenges the trial court's award to appellee Norma Johnson of interests in the value of improvements to appellant's nonmarital real property, some rental income, the proceeds of the sale of a business, an IRA, a 401(k) plan, and certain funds removed from a joint account. We find no error and affirm.

The parties, who married in November 1997, were both sixty-nine years old at the time of trial. For many years before the marriage, appellant was a general contractor and owned an air-conditioning business. He purchased a lot in Marion for $20,000 in 1995 and applied for a permit to construct a house there in September 1997. The parties disagreed at trial about whether they had moved into the new house in 1998 or 1999. They jointly purchased some real property on Highway 77 in West Memphis, where they operated an equipment-rental business. Appellant sold the inventory and equipment from the rental business in April 2008

without sharing the profits with appellee. He then rented that building, keeping the rental payments for himself. After a few years of discord, the parties separated in August 2008.

Appellee sued appellant for divorce on September 9, 2008. Appellant consented to the divorce but contested the disposition of their property rights. On November 4, 2008, appellant filed a motion for a temporary restraining order to prohibit appellee from disposing of her 401(k) retirement plan. On February 17, 2009, the court issued an order awarding temporary possession of the home to appellee and granting possession of various items of personal property, including the vehicles, to each party. The court enjoined both parties from harassing each other and from disposing of any of their property until further orders. On July 13, 2009, appellee filed a petition asking the court to hold appellant in contempt for harassing her. After a hearing, the circuit court found appellant in contempt; directed him to remove all nails, screws, and wires that he had applied to the doors in their garage and shop and to return them to their original condition; and ordered him to refrain from bothering appellee.

At the divorce hearing on December 3 and 4, 2009, the parties, an employee for the Crittenden County Tax Assessor, and an appraiser testified. In its letter opinion, the circuit court found that appellant's lot in Marion remained unimproved until after the marriage in November 1997; that primary construction of the house did not begin until at least January 1998; and that, according to the assessor's office, the house was at least eighty percent complete in April 1999, by which time, the parties had moved in. It found that they did not complete construction of the home until the spring of 1999, even though appellant had testified that it was completed in the spring of 1998. The court found that appellee substantially contributed to these improvements and to the financial well-being of the marriage, noting her testimony, which it found credible, that she had helped build the house by painting, laying tile, wallpapering, installing other materials, and supplying some furnishings. The court noted that the parties had lived in appellee's house in Rosemark, Tennessee, while the new house was being built and found that appellant had induced appellee to sell that house in 1999. The court added:

> As for financial contributions, Plaintiff deposited in the parties' joint bank account the sum of $29,000 between June 2000 and March 2003. She may also have deposited another $4,000 into the joint account from the estate of her deceased mother. Her employment also paid for the health insurance premiums for Defendant and his adult son for much of the marriage. Medicare now covers Defendant. This does not diminish the contributions Defendant also made, financially and by human capital, to the construction of this home. He stated he had paid about $140,000 for these improvements and there is no mortgage debt on the house. Some of these funds came from the sale of the inventory and equipment of the parties' joint business, Renit, which also counts as contributions from Plaintiff.

> The appraised value of the lot and house is now $205,000, of which the lot's value is $35,000. As Defendant purchased the lot prior to the marriage, this is nonmarital property. However, the court is given broad powers under Ark. Code Ann. Section 9–12–315 to distribute all property in a divorce, marital and nonmarital, to reach an equitable division. Based on the facts of this case, I assign Plaintiff a 40% interest in the value of the improvements of this house,

or 40% of $170,000, which equals $68,000.

The court made extensive findings of fact about appellant's disposition of the rental business, and specifically found that he was not credible:

The business previously known as Renit is marital property. . . . Defendant said he paid Harold Hickey $70,000 for this business which the seller financed until the debt was refinanced and converted to a bank loan by First Community Bank. Defendant also indicated he used funds from the sale of his premarital property, the sale of some of his air conditioning business inventory and the sale of his shop metal building in Memphis, to purchase equipment and inventory for this rental business. . . . As best I can glean from the evidence, Defendant bought and sold inventory and equipment for lease in the ordinary course of business and used some of his profits to pay off his bank loans and lines of credit at the end of every year. For example, Defendant sold a backhoe for $13,500 prior to the liquidation auction in April 2008, and used these proceeds to pay the bank. Parenthetically, to say that Defendant was not forthcoming in his examination by Plaintiff's attorney would be an understatement. Getting specific, reliable, and consistent information from Defendant at trial when examined by Mr. Rainey was like pulling teeth. He was obstructive, vague, and to a significant degree, unhelpful during that examination. However, he was a little more understandable and plausible in his testimony upon being questioned by his attorney. In any event, a liquidation auction of this rental business by Devazier Auctioneers occurred in April 2008. The distribution of the proceeds of this auction is subject to dispute by the parties.

Defendant conceded that Plaintiff received nothing directly from the sales/auction proceeds. Initially, Defendant said he could not document where the proceeds of the Devazier auction went; i.e., no paper trail. He operated this business as a sole proprietor, and in fact filed married, but separate federal and state income tax returns in 2006, 2007, and 2008. Apparently, the parties had filed joint tax returns before 2006. Furthermore, Defendant benefited from some substantial depreciation credits on these returns. However, there is no evidence of Plaintiff's income tax returns for those years, so I am unable to determine to what extent she could have benefited from one half of these credits on her return, or hypothetically, if they had continued to file joint returns.

. . . [Defendant] netted $127,787.16 from the auction proceeds, which was a total liquidation of the business including the buybacks from Defendant. Defendant indicated he received only an additional $2,000 from these buybacks from a person named Marshall. I don't find that testimony to be particularly credible. Giving a better explanation of where these proceeds went, Defendant stated that he put $40,000 into certificates of deposit at Regions Bank (one $20,000 and two $10,000 CDs). . . . He said he used another $10,000 to purchase a Kubota tractor; $8,000 down payment toward a $21,000 purchase price on his 2008 Chevrolet pickup truck; and $10,000 to improve the Highway 77 marital property. He further indicated he used the proceeds (without giving specific figures) to pay taxes, contractor's insurance, and that he paid off the home mortgage on 113 Morningside Drive in Marion, which also benefited Plaintiff based on my finding that she has a 40% interest in the value of the house minus the lot.

Form 4797 of Defendant's 2008 federal income tax return appears to substantiate the net profit (the $40,000 put in CDs) Defendant made from the sale of this business property in April 2008. Specifically, this form indicates that Defendant gained or profited $40,180 from this sale. As this is marital property, I find it equitable that Plaintiff receive one-half of this sum, which is also evidenced by the placement of $40,000 in CDs in Regions Bank in May 2008.

The court made the following findings about the parties' cash:

Plaintiff's liquid assets include an IRA worth $3,000; a CD worth $11,000; a 401(k) account worth $60,000; and a bank account worth $3,500. Plaintiff candidly admitted this is all marital property as it has accrued subsequent to the marriage, although it appears that she alone funded these accounts.

Defendant lists one bank account of $2,500 in his Affidavit of Financial Means. This, too, is marital property. In 2006, he liquidated an IRA in the amount of $58,753. Of the sum, he stated $37,000 was premarital which means $21,000 is marital property, for which Plaintiff is awarded one half. [Defendant] was vague on other liquid assets. He said he had a previous money market account at First Community Bank, but that he sold it in 2007 or 2008, and paid household expenses and property taxes with the proceeds. There was also evidence of Defendant's $15,000 CD funded by an IRA opened in the 1980s; a $10,000 CD at Sun Trust Bank which was funded by his interest in his mother's decedent's estate; on March 31, 1998 Defendant had an IRA solely in his name at Oppenheimer Funds of $38,724.01; a $24,000 deposit was made by Defendant into the parties' joint account at NBC, representing part of the proceeds from the sale of Defendant's metal shop building (premarital property) that was later used to purchase inventory and equipment for the marital Renit business; and there was a balance of $38,724.16 in the parties' joint account at First Community Bank, as of April 11, 2005, which account was closed on February 1, 2007, with a balance of $9,790.26; and that he sold two houses prior to the marriage netting him $155,500 at the time. Except for the $21,000 portion of the liquidated IRA above, and the former joint account at First Community Bank, these other assets appear to be nonmarital, having belonged or now belonging to Defendant. As for the difference in the April 2005 balance of $38,724.16 and the closed account balance of $9,790.26 in February 2007, Defendant's explanation was that it "probably" went toward household expenses, improvements, insurance, and taxes. However, there was no specific accounting given. Therefore, I allocate to Plaintiff one half of the difference between $38,724.16 and $9,790.26 ($28,933.90), which is $14,466.95.

In the decree awarding appellee a divorce, the circuit court granted appellee a forty-percent interest in the value of the improvements (the house) on appellant's property in the amount of $68,000 (forty percent of $170,000). The court found that appellant was currently receiving $1,500 per month in rent on the property located on Highway 77 and awarded appellee one-half of the rental income from the beginning of the lease until the property was sold. The court directed the parties to sell the property privately within 120 days, after which it would be sold by the circuit clerk, with the parties sharing equally in the proceeds. The court also found that appellant had placed $40,000 into a CD in Regions Bank from the net proceeds of the

sale of the rental business ($40,180), of which it awarded appellee one-half ($20,090). The court also awarded appellee one-half ($10,500) of appellant's liquidated IRA of $21,000; one-half ($14,666.95) of the $28,933.90 that appellant spent from the First Community Bank joint account; one-half ($1,250) of appellant's bank account containing $2,500; and one-half ($1,000) from the buy-back proceeds of $2,000 from the auction. The court awarded appellant one-half ($30,000) of appellee's $60,000 401(k); one-half ($5,500) of appellee's CDs totaling $11,000; and one-half ($1,750) of appellee's bank account containing $3,500.

The court found that a lot at Horseshoe Lake and two rental houses in West Memphis were appellant's nonmarital property and that thirty-four acres of pasture land near Rosemark, Tennessee, were appellee's nonmarital property. The court awarded a 2008 Mercury Marquis, various items of household furnishings, and a lawnmower to appellee. It awarded appellant a 2008 Chevrolet pickup truck, a Dodge van, a 1946 Chevrolet truck, a 1941 Ford automobile, various items of furnishings, guns, tools, a lawnmower, a tractor, a refrigerator, a john boat, and equipment to appellant. The court awarded additional items of personal property as the parties had agreed. It found that appellant owed appellee $76,716.95 and granted $3,500 in attorney's fees to appellee. It did not award her any alimony. The court ordered appellee to move from the marital residence within thirty days. Appellant then pursued this appeal.

With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm unless those findings are clearly erroneous. *Dial v. Dial,* 74 Ark. App. 30, 44 S.W.3d 768 (2001). On appeal, we review divorce cases de novo, giving due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *Friend v. Friend,* 2010 Ark. App. 525, 376 S.W.3d 519.

Appellant argues that the trial court erred in awarding appellee a forty-percent interest in the value of the improvements (the house), which was built during the marriage on his lot and that the trial court's findings on this issue were clearly erroneous. He refers to his testimony that he obtained the building permit, which was valid for six months, two months before the wedding; that he began construction before the marriage; that he did much of the work himself; that he paid for the slab and plumbing and many other materials himself; that he hired subcontractors for the framing, plumbing, roof, dry-wall, and electrical work; that the roof was on the house by February 1998; and that he installed the air-conditioning and did most of the finish work. Appellant asserts that he paid approximately $140,000 for the construction of the house with funds from the sale of his previous residence and a rent house before the marriage. He states that appellee's only contributions to the home "were aesthetic and superficial" and that she offered no evidence that any of her contributions were directly attributable to the increase in the property's value. We agree with appellant that the trial court made a mistake in finding that some of the $140,000 came from the 2008 sale of the parties' rental business. Apparently, the trial court was confused when it stated in the opinion that the auction's proceeds were partially used to pay off the mortgage on the home; instead, appellant testified that these proceeds paid off the mortgage on the business. However, in light of all the facts and the overall distribution of

property, this error does not warrant reversal.

■ The burden was on appellant to establish that the property was his separate nonmarital property. *Davis v. Davis,* 79 Ark. App. 178, 84 S.W.3d 447 (2002). Arkansas Code Annotated section 9–12–315 (Repl.2009) provides in subsection (a) that all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. The court may make some other division that it deems equitable; however, when it decides not to divide the property equally between the parties, it must recite its basis and reasons for the unequal division in its order. Ark.Code Ann. § 9–12–315(a)(1)(B). The court has broad powers to distribute property in order to achieve a distribution that is fair and equitable under the circumstances; it need not do so with mathematical precision. *Coatney v. Coatney,* 2010 Ark. App. 262, 377 S.W.3d 381.

■ From the definition of marital property, section 9–12–315(b)(1) excludes property that is acquired prior to the marriage. The definition of marital property also does not include property acquired in exchange for property acquired prior to the marriage or the increase in value of property acquired prior to the marriage. Ark.Code Ann. § 9–12–315(b)(2) and (5). However, case law has articulated an exception to this rule for the active appreciation in value of nonmarital assets. *Coatney, supra.* When one spouse makes significant contributions of time, effort and skill that are directly attributable to the increase in value of nonmarital property, the presumption arises that such increase belongs to the marital estate. *Brown v. Brown,* 373 Ark. 333, 284 S.W.3d 17 (2008); *Layman v. Layman,* 292 Ark. 539, 731 S.W.2d 771 (1987). The appellate courts follow an "active appreciation" analysis in determining if one spouse's efforts significantly contributed to the increase in value of nonmarital assets. *Farrell v. Farrell,* 365 Ark. 465, 476, 231 S.W.3d 619, 627 (2006).[1] Additionally, the court may consider a spouse's services to the family that not only directly, but also indirectly, contribute to the nonmarital property's appreciation in value. *See Davis, supra.*

Appellant contends that the "active appreciation" analysis of *Coatney* and *Layman* does not support the award to appellee because there was no evidence that marital funds or appellee's nonmarital funds were directly attributable to any increase in the property's value. We disagree. It is apparent that appellant misunderstands the holdings in those cases; "active appreciation" of the value of the nonmarital property can result from the efforts of both, or either, of the parties. Through both parties' efforts during the marriage, the land in dispute actively appreciated in value.

■ Appellant had little documentation to support his testimony, of which the trial court was extremely skeptical. It is an appellant's burden to bring up a record sufficient to demonstrate error. *Coatney, supra.* Appellee's testimony, which the trial court credited, however, fully supported the court's findings about her contributions. She testified that she helped work on the new house; that she paid for tile and other materials; that they did not

1. Our appellate courts have long held that a non-owning spouse is entitled to some benefit when marital funds have been used to improve or reduce the debt on the other spouse's nonmarital property. *See Box v. Box,* 312 Ark. 550, 851 S.W.2d 437 (1993); *Williford v. Williford,* 280 Ark. 71, 655 S.W.2d 398 (1983); *Camp v. Camp,* 18 Ark. App. 87, 710 S.W.2d 842 (1986).

move into the house until 1999; and that the parties lived in her nonmarital residence while the house was under construction. She said that she essentially supported them during this time, while appellant put his time and earnings into the house. A spouse's earnings acquired subsequent to marriage are classified as marital property. *Davis, supra.* Appellee also stated that she made significant, regular deposits into their joint account for years; that she paid for appellant's and his son's medical insurance; that she had the maximum amount of taxes withheld from her paychecks to improve the parties' tax situation; that she may have deposited some of her mother's estate into the joint account; and that, even after she stopped contributing to the joint account, she paid marital expenses from her personal account. We affirm on this point.

Appellant argues that the trial court erred in awarding appellee one-half of the rental income he received from the Highway 77 property, which was clearly property held jointly, from the beginning of the lease until it is sold because he only used that money to pay his bills. He argues that, in the absence of a finding of fraud or overreaching, which appellee did not assert, a spouse is not entitled to such an offset or reimbursement. We disagree. In exercising its broad powers to distribute property in order to achieve a distribution that is fair and equitable under the circumstances, the trial court may order credits and set-offs as appear equitable and just. *Hodges v. Hodges,* 27 Ark. App. 250, 770 S.W.2d 164 (1989). We have long recognized the trial court's authority to surcharge a spouse for expenditures of marital funds before the filing of the divorce action in order to make an equal division of the marital property. *Id.; see also Friend, supra.* By 2007, appellant

had become very secretive about finances and deliberately kept appellee in the dark, keeping the proceeds of the auction and the rental payments for himself. The trial court simply did not believe his version of events. We also affirm on this point.

Appellant next argues that the trial court erred in awarding $20,090 to appellee as her one-half interest in the net proceeds of the sale of the business, which were deposited into a $40,000 CD in Regions Bank. He notes his testimony that he bought a $20,000 CD and two $10,000 CDs after the sale and that he liquidated one $10,000 CD on May 26, 2009, for living expenses; at the time of trial, a $20,000 CD and a $10,000 CD were still in existence. Appellant asserts that the proceeds from the auction were nonmarital. He claims that the equipment used in the rental business came from the inventory of his air-conditioning business and the sale of his shop in Memphis before the marriage. In any event, he argues, he owes appellee nothing from the $10,000 CD that he liquidated during the marriage. When the issue is whether a source of funds is marital or nonmarital, we defer to the trial court's superior position to resolve credibility questions pertaining to the issue. *Dalrymple v. Dalrymple,* 74 Ark. App. 372, 47 S.W.3d 920 (2001). This is another example of the circuit court's lack of belief in appellant's veracity about the source of the business's inventory and how he spent the proceeds. Noting that appellant cashed in the CD after he had been enjoined from disposing of property, we also affirm on this point.

Appellant further argues that the trial court erred in awarding appellee $1,000 for her one-half interest in the $2,000 buyback proceeds from the April 2008 auction because there was no evidence that they were still in existence and, therefore, "property owned by the parties at the time

of the divorce" as provided in section 9–12–315. He contends that the statute does not authorize the court to "conduct an accounting of the entire marriage and order a party to reimburse the other for any and all funds he or she received during the marriage." As discussed above, the circuit court had authority to make this award.

Appellant next challenges the trial court's award of $10,500 to appellee for her one-half interest in his liquidated IRA totaling $21,000. He refers us to his testimony that, when he liquidated his IRA in 2006, he placed $20,000, which he admitted was marital property, in a CD, and that, at the time of the divorce, that CD was worth only $15,000. Again, appellant argues that the trial court lacked authority to distribute marital property that no longer existed at the time of the divorce. For the same reasons expressed above, we affirm on this point.

Appellant also asserts that the trial court's award to him of $30,000 of the $60,000 in appellee's 401(k) was based on an erroneous finding of fact. He states that appellee testified at trial that her 401(k) was valued at $66,000, not $60,000, at the time of the divorce, and asks us to modify the award to one-half of $66,000. It is true that, when the trial court asked appellee if there was $66,000 in her 401(k), appellee responded affirmatively. However, appellee had already testified that her 401(k) contained $60,000. We therefore cannot say that the trial court's finding is clearly erroneous and affirm on this point.

In his last point, appellant argues that the trial court erred in awarding appellee $14,666.95 as her one-half interest in the $28,933.90 missing from the First Community Bank joint account because those funds were spent between 2005 and 2007 and were not in existence at the time of trial. As expressed above, the trial court had discretion to make this award. *See Hodges, supra.*

Affirmed.

GLADWIN and WYNNE, JJ., agree.