RITA W. GRUBER, Chief Judge
The parties in this case, Jill Grimsley and Pine Drewyor, were divorced by decree entered February 2, 2018, after a sixteen-year marriage. Ms. Grimsley appeals from the divorce decree and a postdecree order, arguing that the circuit court erred (1) by awarding joint custody; (2) by awarding permanent alimony to Mr. Drewyor, who has "ample capacity for self-support"; (3) in the amount of alimony awarded; (4) by awarding Mr. Drewyor a one-half interest in Ms. Grimsley's partnership interest; (5) in its treatment of certain marital debt; and (6) in requiring Ms. Grimsley to make a one-time payment of $ 1.25 million in child support to Mr. Drewyor constituting 25 percent of a five-million-dollar inheritance from her father. We affirm in part and reverse in part.
I. Facts and Procedural History
The parties married in April 2002 when they were both practicing law in Tulsa, Oklahoma. A year after their first child was born in June 2006, the parties moved to Northwest Arkansas to be near Ms. Grimsley's family. Ms. Grimsley accepted an offer from Mitchell Williams in 2007; five years later, she became a nonequity partner; and in January 2016, she became an equity partner. Mr. Drewyor began a solo practice in 2007 and continues to practice as Drewyor Law Firm, PLC. The parties have three children, two daughters and one son, who were eleven, eight, and five at the time the divorce decree was entered.
A. Divorce
Mr. Drewyor filed a complaint for divorce in December 2016, and Ms. Grimsley moved out of the marital home and into her mother's home in April 2017. On April 28, 2017, the circuit court executed an agreed temporary order incorporating a handwritten settlement agreement that provided the children would spend alternate weeks with each parent, Tuesday nights until 8:00 p.m. with the noncustodial parent, and an afternoon each week with Ms. Grimsley's mother, "Grand." Ms. Grimsley agreed to continue to pay child *639 care and the mortgage, taxes, and home insurance on the marital home; Mr. Drewyor agreed to pay the utilities, cleaning, and yard maintenance while he lived in the marital home.
The circuit court conducted a final hearing on custody, child support, alimony, and several property and debt-division issues on November 20 and 21, 2017, and entered a final decree of divorce on February 2, 2018. The court awarded joint custody, continuing the schedule to which the parties had agreed in the temporary settlement agreement of alternate weeks, Tuesday evenings with the parent not having physical custody that week, holidays as set forth in the court's suggested standard-visitation schedule, and ten consecutive, uninterrupted days during summer break with each parent upon thirty days' notice to the other parent. The court ordered that each parent had the right of first refusal to provide care for the children before seeking a third party and that Grand had the right to provide care for the children if neither parent was available before seeking a third party. The court ordered Ms. Grimsley to pay child support to Mr. Drewyor in the amount of $ 1349 "due to the discrepancy in the net earnings of the parties." The court also ordered both parties to "pay an additional amount equal to 25% of any net bonus, income, payment, tax refund or any other funds received as defined by Administrative Order No. 10, as additional child support." Ms. Grimsley was ordered to maintain medical insurance for the children, and the parties were ordered to each pay one-half for medical, psychological, dental, optical, and any other healthcare expenses not covered by insurance. Mr. Drewyor was also awarded permanent alimony of $ 3787 per month. Finding that they were marital property, the court divided equally Ms. Grimsley's Mitchell Williams partnership interest valued at $ 50,500, her "drawing account" valued at $ 77,000, and Mr. Drewyor's law-firm assets valued at $ 8,000. Finally, the court found that an Arvest line of credit used by Mr. Drewyor was his sole and separate obligation, and it ordered Mr. Drewyor to reimburse Ms. Grimsley the sum of $ 30,370 that she had paid to extinguish the loan. However, a Generations Bank line of credit in the amount of $ 25,000 was found by the court to constitute marital debt and the court required each party to pay half.
B. Postdivorce
Less than six months after entry of the divorce decree, Mr. Drewyor filed a petition for citation for contempt, alleging that Ms. Grimsley had received an inheritance valued at $ 5 million in December 2017;[1] that the court's February 2018 decree of divorce and our supreme court's opinion in Ford v. Ford , 347 Ark. 485, 65 S.W.3d 432 (2002), required her to pay 25 percent of that inheritance to him as child support; and that she should be held in contempt for failing to do so.
Ms. Grimsley responded to the petition, denying that she had received any payments or funds in December 2017; stating that she had received a distribution of unregistered, restricted shares of Grand Savings Bank, a closely held corporation, in 2017; arguing that Ford does not support the payment of child support from a transfer of personalty or realty to a joint-custodial parent who is already receiving adequate support; and alleging that Mr. Drewyor had not shown that a transfer of $ 1.25 million to him was in the children's best interest. She argued that Administrative *640 Order No. 10 is premised on the payee's having sole custody and that the amount of child support must be in the best interest of the children, not the payee.
On September 17, 2018, the court held a hearing on the motion for contempt. Ms. Grimsley testified that she had received an inheritance worth approximately $ 5 million, though none of it had been in cash. First, in December 2017, she received a stock certificate representing 296,991 shares of Grand Bancorp, Inc., valued at approximately $ 2.8 million. She testified that the stock was restricted and must be sold to "accredited investors." Second, in March 2018, she received an investment account worth $ 1,869,000. Finally, in June 2018, she received a warranty deed for a lot worth approximately $ 150,000. She said that she had received no money in any of these three transfers. She also testified that the investments would need to be liquidated before she could remove any money from the investment account. While she assumed that she could direct a liquidation of the account, she had never done so and had not intended to do so. She also responded to questions regarding the sale of her lot, indicating that she could attempt to sell the lot but then she would not have a home.
Counsel for Mr. Drewyor argued that the set percentage of 25 percent of any additional income was res judicata pursuant to paragraph 14 of the court's decree of divorce and could not be relitigated and that, consequently, Ms. Grimsley owed child support in the amount of $ 1.25 million, 25 percent of her inheritance. He urged the court to reject Ms. Grimsley's request for a deviation from the 25 percent arguing that the parties were bound both by paragraph 14 of the court's order dictating 25 percent of income and by the supreme court's opinion in Ford interpreting income broadly to include an inheritance. He also claimed that Administrative Order No. 10 put no "cap" on child support; Ms. Grimsley was obligated to pay Mr. Drewyor 25 percent of her inheritance as child support whether it be $ 10,000 or $ 5 million; and she was in contempt for failing to have done so. He rejected Ms. Grimsley's argument that because the inheritance was not in funds or money, she was not obligated to pay child support from it. He argued that she could sell the property and have cash within thirty days or "faster."
Ms. Grimsley argued that the holding in Ford does not support Mr. Drewyor's argument and that a payor is not required to "liquidate" physical assets that have been given to him or her to pay child support. She contended that Ford concerned a situation in which a noncustodial parent was not working at all and therefore was not paying any child support. In such a situation, the court allowed child support to be paid from other assets or income of the payor. She also argued that the court must determine what is an appropriate amount of child support for the parties' children. She contended that Ford does not hold that a payee is automatically entitled to a particular percentage of a lump-sum gift to the payor. Finally, she argued that the court in this case had already ordered an appropriate level of child support with knowledge that she was going to inherit $ 5 million.[2] At the close of the hearing, the court found there was good cause for Ms. Grimsley's failure to pay child support from her inheritance because the transactions had not been "liquidated"; thus, she was not in contempt.
*641 The court entered an order on October 10, 2018, denying the petition for contempt, enjoining Ms. Grimsley from liquidating or transferring any of the inherited assets, and reserving its ruling as to a "sum certain concerning the three transactions" constituting her inheritance. Mr. Drewyor filed a motion for reconsideration, requesting the court to compel Ms. Grimsley to comply with paragraph 14 of the divorce decree and pay 25 percent of her inheritance even though her failure to pay may not have been willful. He argued that the obligation to pay child support from the inheritance attached immediately upon her receipt of the assets and explained that she would not be required to liquidate the bank stock or the lot because there were sufficient assets in the investment account, if sold, to pay him $ 1.25 million.
On October 23, 2018, the court entered an order granting Mr. Drewyor's motion for reconsideration, finding that Ms. Grimsley's $ 5 million inheritance was "subject to child support" pursuant both to paragraph 14 of its decree of divorce and Ford v. Ford . The court ordered her to pay $ 1.25 million within thirty days of the October 10 order.[3] Ms. Grimsley filed a timely appeal from the court's decree of divorce and its order of October 23, ordering her to pay $ 1.25 million in child support to Mr. Drewyor.
II. Points on Appeal
A. Joint Custody
Ms. Grimsley's first point on appeal is that the circuit court erred in awarding joint custody because the parties' dissolution was contentious and the standard orders of visitation assure noncustodial parents "roughly equal access" to the children. She argues that joint custody is not favored unless the circumstances clearly warrant it and that the parties in this case are already in conflict over the children's extra-curricular activities.
The primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. Fox v. Fox , 2015 Ark. App. 367, at 6, 465 S.W.3d 18, 22. Contrary to Ms. Grimsley's argument, our legislature has determined that an award of joint custody is favored in divorce cases. Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Repl. 2015). When in the child's best interest, custody should be awarded in such a way as to ensure the frequent and continuing contact of the child with both parents. Montemayor v. Rosen , 2015 Ark. App. 597, at 10, 474 S.W.3d 114, 119. We perform a de novo review of child-custody matters, but we will not reverse the circuit court's findings unless they are clearly erroneous. Taylor v. Taylor , 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. Smith v. Parker , 67 Ark. App. 221, 998 S.W.2d 1 (1999). Finally, we recognize and give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. Id.
We turn to the testimony at trial. Ms. Grimsley testified that before the parties' separation, they had raised the children in a team effort and were both very involved parents. She said, "Pine is a good parent, sometimes." After their separation and while they shared joint physical custody, she said that she noticed things that caused her concern about Mr. Drewyor's *642 having custody. She testified that she was concerned with his ability to organize the children's schedules, pack their lunches and backpacks, and get them to school and activities on time. She also expressed concern about his ensuring that the children's homework was done and about consistency regarding meals, bedtimes, hygiene, and grooming. Finally, she testified that she was worried about Mr. Drewyor's financial stability and his ability to meet the children's financial needs. She requested the court to award primary custody to her with liberal visitation to Mr. Drewyor.
Mr. Drewyor agreed with Ms. Grimsley that before the separation, they had split the parenting responsibilities equally and approached parenting as a "team effort." He testified that he would handle the mornings: getting the children up and making breakfast; ensuring that the children had their backpacks, water bottles, and lunches; taking the girls to school; and returning home to get ready for work. He said that either he or Ms. Grimsley would take their son to preschool on the way to work. He testified that because of the flexibility of his law practice, he had been able to attend all the children's school events and parent-teacher conferences. He also said that he coached their son's soccer team. He said that he was not able to take every case that he wanted because of his commitment to the children. He thought it was in the children's best interest to have equal time with both parents, was committed to fostering a positive and healthy relationship between the children and Ms. Grimsley, and preferred to continue the joint-custody arrangement, but he wanted primary custody if joint custody was not awarded.
At the conclusion of the trial, the court found that it was in the best interest of the children to award joint custody. The court specifically stated from the bench that the parents had been cooperative regarding communication, activities, pickup and delivery, appointments, and homework. The court also noted that the children were excelling in school and have a supportive grandmother capable of assisting when the parents were unable to provide care.
On appeal, Ms. Grimsley argues that the court erred in not awarding her primary custody, asserting that the parties parted in hostility with no trust between them. She contends that if she had primary custody, Mr. Drewyor would continue to have liberal visitation-43 percent of the time, according to her-rather than having custody 50 percent of the time. She claims that this would prevent needless conflict over shared decisions.
Our de novo review does not leave us with a definite and firm conviction that a mistake has been made in this case. Ms. Grimsley testified that the parties had raised the children as a team, and she agreed when the parties separated to joint custody with equal time. Most joint-custody situations involve some amount of disagreement. Ms. Grimsley asks us to reweigh the testimony and find differently than the circuit court regarding the appropriateness of joint custody; however, credibility determinations are left to the circuit court, and we will not reweigh the evidence. Glisson v. Glisson , 2018 Ark. App. 21, at 11, 538 S.W.3d 864, 869. Accordingly, we hold that the circuit court did not clearly err in finding that joint custody is in the best interest of the children.
B. Alimony
We address Ms. Grimsley's second and third points on alimony together. For her second point on appeal, she argues that the circuit court erred in awarding permanent alimony to Mr. Drewyor because he has the capacity, if not the will, to sustain his lifestyle. Specifically, Ms. Grimsley contends that permanent alimony is not appropriate in a case in which the payee is *643 able, through reasonable personal efforts, to meet his financial needs but chooses not to. She argues that Mr. Drewyor is an educated, healthy, experienced lawyer and mediator with the ability to earn more money. She claims that it is inequitable to require her to subsidize his choice to work at less than his capacity on a permanent basis. She argues that the circuit court's order is even "more problematic" because it awards permanent alimony rather than time-limited "rehabilitative" alimony. For her third point on appeal, she contends that the amount and type of alimony awarded were erroneous.
We turn first to the circuit court's specific award:
40. The Court finds that [Mr. Drewyor] has established his burden of proof to his entitlement to an award of alimony in this matter and the Court finds from the evidence adduced, including testimony of [Ms. Grimsley], that [Mr. Drewyor] has a net monthly need in the sum of $ 8350. From that amount the Court deducts [Mr. Drewyor's] historical monthly earnings of $ 3,214.00 as well as the child support to be paid by [Ms. Grimsley] in the sum of $ 1,349 resulting in a final need of $ 3,787 per month. Accordingly, the Court finds that [Ms. Grimsley] should be, and hereby is, ordered and directed to pay alimony in the sum of $ 3,787 per month until there has been a basis for a modification or termination as provided by Arkansas Code Annot. § 9-12-312.
The following demonstrates the impact of the court's awards on the parties' respective monthly incomes:
Ms. Grimsley Mr. Drewyor Net earnings $9444 Net estimated earnings $3214 Less child support $1349 Plus child support $1349 Less alimony paid $3787 Plus alimony $3787 Adjusted monthly income $4308 Adjusted monthly income $8350
An award of permanent alimony is authorized under Arkansas Code Annotated section 9-12-312(a) (Repl. 2015), which states that when a divorce decree is entered, the circuit court may enter an order concerning alimony that is "reasonable from the circumstances of the parties and the nature of the case." We will not reverse a circuit court's decision regarding an award of alimony absent an abuse of discretion. Craig v. Craig , 2010 Ark. App. 718, at 5, 379 S.W.3d 590, 593.
The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case, and the primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. Foster v. Foster , 2016 Ark. 456, at 9, 506 S.W.3d 808, 814-15. The court should also consider the following secondary factors: (1) the financial circumstances of both parties; (2) the amount and nature of the income, both current and anticipated, of both parties; (3) the extent and nature of the resources and assets of each of the parties; (4) the earning ability and capacity of both parties. Kuchmas v. Kuchmas , 368 Ark. 43, 45-46, 243 S.W.3d 270, 271-72 (2006).
Mr. Drewyor testified that while in Tulsa, he had worked in the district attorney's office and for a private law firm practicing insurance defense. He said that during his last year in Tulsa, he had billed 2400 hours and had earned $ 84,000. He testified that he had been in a general solo *644 practice since moving to Northwest Arkansas in 2007, practicing primarily personal-injury and domestic-relations law. He said that he billed $ 200 per hour but admitted that was probably a low rate for his level of experience and he should probably increase it. He stated that he had "substantially more flexibility" at work than did Ms. Grimsley and he was able to help with the kids' appointments, conferences, and other needs. Although it is difficult to tell from the testimony and evidence precisely what Mr. Drewyor earned in 2017 or the previous years, he testified that he believed he could earn a monthly net income of $ 3214. We note that he had reported a net loss for at least the past five years.[4] He testified that he was requesting alimony to meet his monthly need of $ 8500, although he said it "would be substantially less" than the children were used to and would mean fewer "Disney cruises" and a smaller home.
Ms. Grimsley's testimony reflected that she earned $ 215,000 in 2017, with a monthly net amount of $ 9440. Ms. Grimsley asked the court not to award Mr. Drewyor any alimony, testifying that he maintained the identical professional degree that she did, was not a stay-at-home parent while the parties were married, and was capable of earning more than he had in the past but had chosen not to. She testified that they had always employed nannies and babysitters so that both she and Mr. Drewyor could work fulltime. Ms. Grimsley said that, at one point, she had attempted to save money on a nanny by asking Mr. Drewyor to pick up the children from school several days each week, but he had declined to do so.
She argued to the circuit court that Mr. Drewyor was not entitled to permanent alimony because alimony is not designed to subsidize a capable and able-bodied professional's choice not to meet his own financial needs. She also argued that rehabilitative alimony is not appropriate because Mr. Drewyor had not submitted a plan or need to transition back into the workforce or earn a degree to allow him to meet his own needs in a specified and limited period of time: he already had a degree and a law practice that allowed him to meet his financial needs.
We agree with Ms. Grimsley that the circuit court abused its discretion in awarding permanent alimony of $ 3787 based on the facts of this case. The evidence demonstrated that both parties are lawyers and that both have been in full-time practice since they married. Neither party stayed home to raise the children. They both testified that they had parented as "a team" while married, and the court awarded joint custody with the parties to share precisely equal physical custody. Although it appears that Ms. Grimsley has earned more than Mr. Drewyor since their move to Northwest Arkansas, it is difficult to tell from the record before us if that is because Mr. Drewyor has chosen to work less, if he has spent an inordinate amount on expenses, or if he has been unable to secure sufficient work in his solo practice to earn more. Whatever the reason, the fact remains that he, like Ms. Grimsley, has a license to practice law and over fifteen years' experience doing so.
Mr. Drewyor currently earns less than Ms. Grimsley; however, he presented no evidence that he was incapable of earning a living in his profession or of working more hours. As Ms. Grimsley has argued, he is educated, healthy, and experienced. Indeed, over a decade ago, while he practiced law in Tulsa, he worked and earned more than he does now. He testified that he plans to continue in solo practice, which provides him with "flexibility," rather than *645 using his skills to obtain other employment where he might earn more money. This is his choice. Here, the parties have equal earning capacities and share joint custody with equal physical custody. The law does not require Ms. Grimsley to pay permanent alimony to support this choice when it results in such an inequitable distribution of their monthly incomes, leaving him almost twice the income left to her. Accordingly, we hold that the circuit court's alimony award in this case constituted an abuse of discretion, and we reverse.
C. Mitchell Williams Partnership Interest
Ms. Grimsley also challenges the court's finding that her partnership interest at Mitchell Williams is marital property and its award to Mr. Drewyor of one-half of the $ 50,500 used to purchase the interest. Mr. Drewyor contends that the partnership interest was acquired during the marriage and thus constitutes marital property. He argues that Ms. Grimsley's subsequent satisfaction of the debt used to purchase the asset with nonmarital funds did not convert the asset to nonmarital property. He cites Kelly v. Kelly , 2011 Ark. 259, 381 S.W.3d 817, in support of his argument.
Ms. Grimsley testified that she became an equity partner at Mitchell Williams in January 2016 for a purchase price of $ 50,500, two years before the parties were divorced. She borrowed the money from First Security Bank to purchase the membership. She testified that in February or March 2016, she received a gift of $ 300,000 from her father, which she deposited into an account in her sole name. She then used part of the $ 300,000 to pay off the First Security Bank loan. She testified that she did not intend to make a gift of the partnership interest to Mr. Drewyor when she paid off the loan and that Mitchell Williams does not allow anyone outside the partnership to hold an interest in the firm. Mr. Drewyor requested that Ms. Grimsley pay him one-half of the value of her interest in her partnership in Mitchell Williams claiming that it was marital property, although he recognized that he could not personally hold an equity interest in the law firm. At the hearing, the court found that Ms. Grimsley's partnership interest was a marital asset, and the money she used to pay off the First Security loan used to purchase the interest constituted a gift to the marital union.
Arkansas Code Annotated section 9-12-315 provides that "all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable." Ms. Grimsley cites no authority for her argument that the partnership interest, acquired during the marriage, is not marital property. Further, she provides no authority that, as a matter of law, the use of nonmarital funds to satisfy the debt obligation on a marital asset converts the asset from marital to nonmarital. We will not consider an argument that is not supported by citation to authority or convincing argument. Foster v. Foster , 2010 Ark. App. 594, at 11, 377 S.W.3d 497, 505. Accordingly, we affirm the court's decision regarding this asset.
D. Generations Bank Debt
For her fifth point on appeal, Ms. Grimsley contends that the Generations Bank debt of $ 25,000 should be paid solely by Mr. Drewyor and that the circuit court erred in ordering her to pay half. Ms. Grimsley argues that the money was used by Mr. Drewyor to fund his office and to pay his own credit-card debt. She alleges that she did not consent to the line of credit and that it is not a marital obligation. Mr. Drewyor testified that the money from the line of credit "likely" would have gone into the joint account to pay credit-card debt and family bills. He *646 insisted in his testimony that the funds from the line of credit benefited the marital estate and constituted a marital obligation.
Unlike the allocation of marital property, the division of marital debt is not addressed in a statute. We have held that the allocation of marital debt must be considered in the context of the distribution of all the parties' property. Boxley v. Boxley , 77 Ark. App. 136, 141, 73 S.W.3d 19, 23 (2002). Additionally, the court has broad powers to distribute property in order to achieve a distribution that is fair and equitable under the circumstances; it need not do so with mathematical precision. Coatney v. Coatney , 2010 Ark. App. 262, at 6, 377 S.W.3d 381, 384. We will not reverse a circuit court's allocation of debt unless it is clearly erroneous. Friend v. Friend , 2010 Ark. App. 525, at 11, 376 S.W.3d 519, 526. A court's determination that debts should be allocated between the parties in a divorce case on the basis of their relative ability to pay is not a decision that is clearly erroneous. Boxley , 77 Ark. App. at 142, 73 S.W.3d at 23. In this case, Mr. Drewyor testified that he used the money to pay family expenses. We defer to the circuit court's superior position to resolve issues of credibility. Johnson v. Johnson , 2011 Ark. App. 276, at 12, 378 S.W.3d 889, 896. On this record, we cannot say that the circuit court's allocation of this debt was clearly erroneous.
E. Lump-Sum Child Support
For her last point on appeal, Ms. Grimsley contends that the circuit court erred in requiring her to make a one-time payment of $ 1.25 million in child support to Mr. Drewyor, constituting 25 percent of a $ 5 million inheritance from her father. She argues that it exceeds the children's needs and constitutes disguised alimony. She argues further that the inheritance she received was not in the form of a "payment" or "funds" for purposes of Administrative Order No. 10 because none of the inheritance had been liquidated.
We turn first to the law governing awards of child support. Arkansas Code Annotated section 9-12-312(a) directs a court to make an order "concerning the care of the children" that is "reasonable from the circumstances of the parties and the nature of the case." There is a rebuttable presumption that the amount set forth in the family-support chart of Administrative Order No. 10 is the correct amount but allows the court to grant more or less support "if the evidence shows that the needs of the dependents require a different level of support." Ark. Sup. Ct. Admin. Order No. 10(I). The statute and Administrative Order No. 10 refer to the payor as the "noncustodial parent," although our law authorizes reference to the chart in joint-custody cases as well.[5] See, e.g. , Glisson , 2018 Ark. App. 21, at 11, 538 S.W.3d at 869 ; Hayes v. Otto , 2009 Ark. App. 654, 344 S.W.3d 689. Administrative Order No. 10 also allows a court to include child support from other income or bonuses based on a percentage that fluctuates with the number of dependents. Ark. Sup. Ct. Admin. Order No. 10(II). For three children, the number is 25 percent. Id. Administrative Order No. 10 defines "income" as any form of "payment" due to an individual, regardless of source, including wages, salaries, commissions, bonuses, worker's compensation, disability, payments pursuant to a pension or retirement program, and interest. Id. ; see also McWhorter v. McWhorter , 346 Ark. 475, 481, 58 S.W.3d 840, 844 (2001). Our supreme court has stated that income "is intentionally broad and designed to encompass the widest range of sources for the support of minor *647 children." Davis v. Office of Child Support Enf't , 341 Ark. 349, 358, 20 S.W.3d 273, 278 (2000).
We review domestic-relations cases de novo on the record, and we will not reverse a finding of fact by the court unless it is clearly erroneous. Hunter v. Haunert , 101 Ark. App. 93, 97, 270 S.W.3d 339, 343 (2007). However, when the amount of child support is at issue, we will not reverse the circuit court absent an abuse of discretion. Ryburn v. Ryburn , 2014 Ark. App. 108, at 6, 432 S.W.3d 102, 106.
The divorce decree in this case ordered Ms. Grimsley to pay child support to Mr. Drewyor calculating each party's obligation pursuant to the family-support chart based on their stated monthly incomes. Subtracting Mr. Drewyor's chart obligation from Ms. Grimsley's obligation, the court ordered Ms. Grimsley to pay a monthly amount of $ 1349 to Mr. Drewyor. She did not appeal from that award. The order also contained the following paragraph:
14. Additionally, the Court finds that the Plaintiff and Defendant shall each pay an additional amount equal to 25% of any net bonus, income, payment, tax refund, or any other funds received as defined by Administrative Order No. 10, as additional child support with said sums to be paid within seven days of receipt of said additional monies by either, together with a copy of all documentation necessary to advise the other of the gross amount received and those allowed deductions as set forth in Administrative Order No. 10.
Less than six months after this decree was entered, Mr. Drewyor filed a petition for contempt in an attempt to secure 25 percent of Ms. Grimsley's inheritance. Although the court initially denied this request finding that the three transactions comprising the inheritance had not been "liquidated," it granted Mr. Drewyor's motion for reconsideration. In its order granting his motion and ordering Ms. Grimsley to pay Mr. Drewyor $ 1.25 million in child support, the court did not make any specific findings regarding liquidation, financial needs of the children, or best interest. The order simply stated that the $ 5 million inheritance was "subject to child support" pursuant to both paragraph 14, setting an amount of 25 percent of any additional income received, and Ford , 347 Ark. 485, 65 S.W.3d 432.
Before we turn our attention to Ford , we must consider our supreme court's opinion in Dare v. Frost , 2018 Ark. 83, 540 S.W.3d 281. In Dare , the court held that the increase in a noncustodial parent's investment account was not "income" required to be included in the calculation of his child-support obligation. The custodial parent, Dare, filed a motion for modification of child support based on the growth in the stock portfolio of the noncustodial parent, Frost. The circuit court denied Dare's request, finding that the growth in Frost's portfolio should be counted as income for child-support purposes only when it was "realized" by the owner, which the court suggested meant disbursed. Dare , 2018 Ark. 83, at 6, 540 S.W.3d at 285. Our supreme court affirmed the circuit court's order, noting that Frost testified at trial that he did not "see any money from his stock portfolio" and that there was no evidence in the record to indicate what form the capital gains and dividends reflected on Frost's tax returns had been taken. Id. Although there was nothing in the case indicating how Frost had come into possession of this investment account-his own savings, gift, inheritance, or otherwise-we see nothing in the court's opinion limiting its decision on that basis.
In a case that is consistent with the supreme court's decision in Dare , this *648 court reversed and remanded an award of child support on a capital gain that had not been "realized" by the noncustodial parent. White v. White , 95 Ark. App. 274, 236 S.W.3d 540 (2006). In White , we held that the circuit court's award of child support on a lump-sum capital gain was an abuse of discretion, reasoning that the noncustodial parent had not "sold or otherwise disposed of the property" and thus had not "realized a gain." We held that this lack of a sale or disposition distinguished the case from Ford :
It is this lack of sale or disposition that distinguishes this case from Ford v. Ford , 347 Ark. 485, 65 S.W.3d 432 (2002), where our supreme court held that one-time income such as an inheritance and the cashing in of a certificate of deposit was "income" within the meaning of the guidelines. Under the facts of this case, we hold that the trial court abused its discretion by including the capital gain in Phillip's income for child-support purposes. We therefore reverse and remand for proper calculation of Phillip's child-support obligation.
White , 95 Ark. App. at 283, 236 S.W.3d at 546-47.
In the case at bar, the parties do not dispute that Ms. Grimsley's inheritance consists of a stock certificate representing 296,991 shares of restricted stock in a closely held bank; an investment account; and a lot. She testified that she had not received any money with any of the three transactions, that she had not received any money from the investment account, and that none of the assets had been liquidated. No evidence was presented to dispute this testimony. We hold that these three assets do not constitute income as defined in Administrative Order No. 10(II) and that the circuit court abused its discretion in awarding 25 percent of the inheritance to Mr. Drewyor as child support. We therefore reverse the court's order of October 23, 2018.
Additionally, we are concerned with the court's failure in this matter to exercise its discretion. In determining the appropriate amount of child support, particularly when the amount is not specifically designated by the family-support chart, it is critical that the court exercise its discretion. The purpose of child support is to provide for children's "reasonable needs." Gilbow v. Travis , 2010 Ark. 9, at 8, 372 S.W.3d 319, 324. It is not to provide for the accumulation of capital by children. Smith v. Smith , 341 Ark. 590, 596, 19 S.W.3d 590, 594 (2000) ; see also Kemp v. Kemp , 2011 Ark. App. 354, 384 S.W.3d 56.
Here, no evidence was presented at the hearing regarding the children's needs, and the court made no findings about their needs or best interest to support such a large child-support award. The court simply determined that the result was required by paragraph 14 of its previous order and our supreme court's opinion in Ford .[6] See Evans v. Tillery , 361 Ark. 63, 204 S.W.3d 547 (2005) (affirming child-support award of $ 31,195.95 on a lump-sum judgment from a lawsuit where circuit court directed that funds be used to benefit the child and required the custodial parent to provide a monthly itemization to the noncustodial parent of how the money was expended with substantiating invoices). While we recognize our supreme court's mandate that income be interpreted broadly for the "benefit of the child," Ford , 347 Ark. at 495, 65 S.W.3d at 439, we hold that the circuit court's reliance on *649 Ford to support its decision in this case was misplaced. We do not interpret Ford to require a joint custodian to pay a set percentage of any gift or inheritance to the other joint custodian as child support. Ford does not abrogate a circuit court's duty to exercise its discretion in every case to ensure that the award is necessary to provide for the reasonable needs of the children. The lump-sum payment at issue in Ford included a $ 3000 gift from a grandparent,[7] not a $ 5 million inheritance. Further, it was not a case involving joint custody in which the payor was already paying child support to the other joint custodian.
We affirm the court's order awarding joint custody; awarding Mr. Drewyor a one-half interest in Ms. Grimsley's partnership interest; and dividing equally the Generations Bank debt. We reverse its award of alimony and its lump-sum award of child support to Mr. Drewyor.
Affirmed in part; reversed in part.
Klappenbach and Murphy, JJ., agree.

Ms. Grimsley's father died in a plane crash in August 2016, which vested Ms. Grimsley with a $ 5 million interest in his trust. She reported this interest in her affidavit of financial means, which Mr. Drewyor introduced at the divorce trial.

At this point in counsel's argument, the court interjected, stating that Mr. Drewyor knew about the inheritance at the divorce hearing and was not "going after the inheritance as part of the property settlement agreement."

This court granted Ms. Grimsley's motion for supersedeas with increased third-party security on December 5, 2018.

In some of those years, however, he reported high earnings.

See Ark. Code Ann. § 9-13-101(b)(1)(A)(iv) (providing child support under joint-custody order is discretionary and must be consistent with Administrative Order No. 10).

As we noted previously, $ 2.8 million of that inheritance-the 296,991 shares of Grand Bancorp, Inc.-was received in December 2017 while the parties were still married and before the February 2018 entry of the divorce decree ordering Ms. Grimsley to pay child support.

The circuit court also ordered the noncustodial parent to pay child support on farm income, a one-time retirement payment, and a certificate of deposit for a total amount of $ 263 per month based on $ 14,200 income.