Cite as 2020 Ark. App. 394

# ARKANSAS COURT OF APPEALS

DIVISION II

No. CV-19-625

| | | |
|---|---|---|
| CHARLES SYMANIETZ | | **Opinion Delivered** September 9, 2020 |
| | APPELLANT | |
| | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-18-129] |
| V. | | |
| DEBORAH SYMANIETZ | | |
| | APPELLEE | HONORABLE DOUG SCHRANTZ, JUDGE |
| | | SUBSTITUTED OPINION ON GRANT OF REHEARING; AFFIRMED |

## RITA W. GRUBER, Chief Judge

On March 18, 2020, in *Symanietz v. Symanietz*, 2020 Ark. App. 189, 598 S.W.3d 839, we affirmed the parties' divorce decree entered by the circuit court on January 22, 2019. On April 6, 2020, Charles Symanietz filed a petition for rehearing; Deborah Symanietz did not file a response. We grant the petition for rehearing and issue the following substituted opinion affirming the circuit court's decree.

Charles and Deborah were married in 1991 and separated in September 2017. At the time of the divorce, the parties had two minor children and a disabled adult daughter, all three of whom lived with Deborah. The parties' sole source of income since 2009 had been their jointly owned trucking business, Symanietz Enterprises. Charles drove the truck, and Deborah managed the business, which included dispatching and accounting. At the final divorce hearing held on November 8, 2018, the court first addressed Deborah's motion for

contempt for Charles's failure to pay previously ordered child support. In the January 2019 divorce decree, the court found Charles in contempt and ordered him to pay $160 a month until the $3,500 arrearage had been paid in full. The court then awarded custody of the children to Deborah, imputed income of $3,400 per month to Charles, and set child support at $800 per month. The court also ordered Charles to pay $100 a month in rehabilitative alimony for two years so long as Deborah was receiving $2,000 a month in income from Symanietz Enterprises. If Symanietz Enterprises stopped paying Deborah (and she had not voluntarily terminated her employment), then Charles's alimony obligation increased to $2,000 per month for the remainder of the two-year period. Finally, the court found that it was not bound by a purported mediation agreement between the parties that agreed on the disposal of certain real property.

Less than two months after the divorce decree was entered, Deborah moved for contempt and asserted that Charles had failed to pay child support, child-support arrearages, and costs and attorney's fees as ordered. After a hearing on May 29, 2019, Charles was held in direct criminal contempt of court and sentenced to ten days in the Benton County jail. In a separate order filed June 5, 2019, the court found Charles in willful contempt of the court's order from the divorce decree and ordered that he be incarcerated for fourteen days in the Benton County jail, to run consecutively to the previous ten-day sentence. The circuit court entered a total judgment of $15,000 for unpaid spousal support and attorney's fees and found that Charles could "purge himself of the 14-day sentence for Contempt by paying this amount to the Plaintiff." Charles filed an amended notice of appeal from both contempt orders on July 8, 2019. On appeal, he contends that the circuit court erred in

calculating the amount of child support awarded, awarding alimony to Deborah, not honoring the parties' mediation agreement, and holding him in contempt.

## I. *Child Support*

For his first point on appeal, Charles asserts that the circuit court erred in its calculation of child support. Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Hall v. Hall*, 2013 Ark. 330, 429 S.W.3d 219. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id*. As a rule, when the amount of child support is at issue, we will not reverse the circuit court's order absent an abuse of discretion. *Id*. However, a circuit court's conclusion of law is given no deference on appeal. *Id*.

In determining the appropriate amount of child support, courts refer to the family support chart contained in Administrative Order No. 10, which provides a means of calculating child support based on the payor's net income. *Cowell v. Long*, 2013 Ark. App. 311. Arkansas Supreme Court Administrative Order No. 10(III)(c) provides that for self-employed payors, the circuit court should first consider the payor's tax returns, specifically the last two years' federal and state income tax returns. *See also Tucker v. Office of Child Support Enf't*, 368 Ark. 481, 247 S.W.3d 485 (2007). Section (III)(c) also dictates that the circuit court "shall consider the amount the payor is capable of earning or a net worth approach based on property, life-style, etc." Arkansas Supreme Court Administrative Order No. 10(III)(d) provides that "[i]f a payor is unemployed or working below full earning capacity, the court may consider the reasons therefor. If earnings are reduced as a matter of

3

choice and not for reasonable cause, the court may attribute income to a payor up to his or her earning capacity, including consideration of the payor's life-style."

Charles first asserts that the circuit court failed to follow the proper procedure in determining his income. He claims that the circuit court was required to consider his tax returns for the prior two years before it could impute any income to him and that it had to make a written finding explaining why imputation of income was necessary. The 2016 and 2017 tax returns show Charles's share of the parties' income was $34,166 and $32,746, respectively, and Charles contends that the circuit court should have based the child-support order on those figures.

What Charles's argument fails to recognize is that the circuit court was not limited to his tax returns; under section (III)(c), the court "shall consider the amount the payor is capable of earning," and under section (III)(d), the court "may attribute income to a payor up to his or her earning capacity." The circuit court found that Charles was working below his full earning capacity and therefore imputed an income that the circuit court deemed reasonable, specifically making the following findings at the hearing:

> Based on the evidence that I've seen here, this was a struggle to make ends meet, largely because Mr. Symanietz chose not to drive from time to time. . . . [I]t has been obvious that Mr. Symanietz works at this business when he chooses to, and when the trouble came, for whatever reason, between these two, he chose not to do so so regularly.
>
> . . . .
>
> I am convinced, based on the IRS records and the work records that have been provided in the course today, that Mr. Symanietz is very capable of earning a minimum of $3400 a month if he applies himself at this trucking business, and I impute that income to him and set child support at $800 per month.

This was not error.

4

Secondly, Charles contends that the circuit court erred in imputing income because his income had not been reduced "as a matter of choice and without reasonable cause." He argues that Deborah stopped working for the family business in the face of divorce proceedings and that she took business funds for personal use, and he implies that this is what caused his decline in income. He also asserts that the circuit court assessed him with an imputed income beyond his earning capacity because he had no functioning vehicle, no dispatcher, and no funds to pay for either.

The circuit court heard testimony from both parties on the state of their finances and the reasons behind them, and we give due deference to the court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Hall*, 2013 Ark. 330, at 4, 429 S.W.3d 221–22. We hold that the court did not clearly err in imputing Charles's income.

## II. *Spousal Support*

Arkansas Code Annotated section 9-12-312(a) provides that the circuit court may enter an order concerning alimony that is "reasonable from the circumstances of the parties and the nature of the case." Ark. Code Ann. § 9-12-312(a) (Supp. 2019). The purpose of alimony is to rectify the economic imbalance in earning power and standard of living in light of the particular facts in each case, and the primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Foster v. Foster*, 2016 Ark. 456, at 9, 506 S.W.3d 808, 814–15. The circuit court may also consider secondary factors, such as (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the

5

extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; and (12) the amount of child support (if applicable). *Moore v. Moore*, 2016 Ark. 105, at 10–11, 486 S.W.3d 766, 773. There is no mathematical formula or bright-line rule in awarding alimony because the need for flexibility outweighs the need for relative certainty. *Nauman v. Nauman*, 2018 Ark. App. 114, at 8, 542 S.W.3d 212, 217.

We will not reverse a circuit court's decision regarding an award of alimony absent an abuse of discretion. *Perser v. Perser*, 2019 Ark. App. 467, at 10, 588 S.W.3d 395, 403. An abuse of discretion means discretion improvidently exercised, i.e., exercised thoughtlessly and without due consideration. *Webb v. Webb*, 2014 Ark. App. 697, at 3, 450 S.W.3d 265, 269. The circuit court is in the best position to view the needs of the parties in connection with an alimony award. *Smithson v. Smithson*, 2014 Ark. App. 340, at 2, 436 S.W.3d 491, 493.

To reiterate, the circuit court ordered Charles to pay $100 a month in alimony if Deborah was receiving $2,000 a month or more in income from Symanietz Enterprises, but if she ceased receiving that amount from the business and did not voluntarily terminate her employment, Charles's obligation would increase to $2,000 a month. This alimony obligation was for two years. The court found that Charles's earning capacity was much greater than Deborah's and also noted that she had the burden of caring for a disabled adult daughter.

Charles argues that assessing alimony was error because the parties had "precisely equal earnings and Deborah chose not to work." He contends that the award was "particularly abusive" because it required him to pay Deborah all his income. He cites our decision in *Grimsley v. Drewyor*, 2019 Ark. App. 218, 575 S.W.3d 636, in support of his position.

The parties had operated Symanietz Enterprises since 2009, and it had been their sole source of income. The parties had always split the income earned by the business 50/50. Evidence introduced at the hearing established the following income from the company since 2014, which the parties had split: $70,897 in 2017; $68,331 in 2016; $103,379 in 2015; and $91,345 in 2014. Charles testified that they had "grossed" $150,000 and $250,000 in some years. Deborah testified that about a year before the hearing, Charles had determined they should each take $2,000 per month from the business, which they had been doing.

Charles's explanation at the hearings, in both July and November, for why the trucking business was making less money than it had in the past was that the truck needed repairs and he did not have sufficient funds to fix it. He also blamed Deborah's "mismanagement" for the lack of funds. Regarding his professional skills, he testified that he has a commercial driver's license, had built houses, had owned and operated a carpet-laying company, could probably work in sales, and is a "jack of all trades." He also said that he "had never punched a clock," had always worked for himself, and was not going to hire himself out as an employee truck driver because he had never been an employee.

Deborah testified that she was willing to continue working for Symanietz Enterprises but that she would seek other employment in the trucking business if Symanietz did not continue to operate. She said that aside from a brief period as a waitress, she had always

7

worked with Charles. She said that she did not need alimony if they continued to operate the business but otherwise requested $3,500 per month including alimony and child support. She testified that Charles had changed his behavior since the parties' separation, refusing to take runs that she would find for him. She said that while freight was "hot" and that the runs were more lucrative than they had ever been in the past, they were making less money because Charles refused to take the good runs she found. She said he did take runs that he dispatched himself after telling her that the truck was not working. She found out about these runs when he needed her to do paperwork for the run. She said that Charles had taken 101 days off between the July hearing and the final divorce hearing in November. Finally, both parties testified that Charles had gotten back on the road and had taken jobs almost immediately after the July hearing, even though he had testified that he could not drive the truck without performing repairs.

Assessing the credibility of the witnesses is a matter for the circuit court. *Trucks v. Trucks*, 2015 Ark. App. 189, at 3, 459 S.W.3d 312, 314. The court heard the testimony, reviewed the evidence, and found that Charles's complaints about Deborah's mismanagement did not "make sense." The court found the couple's recent struggle to make ends meet was "largely because Mr. Symanietz chose not to drive from time to time." The court did not believe Deborah had the ability to earn "anywhere near the money" that Charles was capable of and noted that she also had the burden of caring for a disabled adult daughter. The court then recognized that it could not order the parties to continue in business together but suggested it as a way to continue to provide for their daughters "in a much better rate than if they try to take hourly positions somewhere." The court determined that Charles's own acts were the primary reason for the reduction in earnings.

Finally, the facts in this case are significantly different from those in *Grimsley v. Drewyor*. The parties here were married for over twenty-seven years, Deborah had sole custody of the two children and was caring for an adult disabled daughter, and the alimony award was for two years only. In *Grimsley*, the parties, both practicing attorneys, had identical professional degrees, licenses, years of experience, and earning capacities; they shared joint custody of the children; and the court awarded permanent alimony to Mr. Drewyor. *Grimsley*, *supra*. While Deborah testified in this case that she could make more money continuing to work in the parties' jointly owned trucking business, she planned to seek work as a dispatcher if Symanietz Enterprises dissolved. She did not request, nor did the court award, permanent alimony so that she could work less. In *Grimsley*, Mr. Drewyor intended to rely on permanent alimony in order to continue in solo practice and maintain "flexibility" rather than use his skills to obtain other employment where he might earn more money. *Grimsley*, 2019 Ark. App. 218, at 15, 575 S.W.3d at 644–45. We held that permanent alimony was not designed to subsidize a capable and able-bodied professional's choice not to meet his own financial needs. *Id*. at 15, 575 S.W.3d at 645. That simply is not what we have here. We hold that the court did not abuse its discretion in awarding rehabilitative alimony that is reasonable from the circumstances of the parties and the nature of the case.

III. *Mediation Agreement*

For his third point, Charles argues that the circuit court erred in refusing to consider the parties' mediation agreement. In domestic-relations cases, we will not reverse a circuit court's finding of fact unless it is clearly erroneous. *Hunter v. Haunert*, 101 Ark. App. 93, 270 S.W.3d 339 (2007). A finding is clearly erroneous when, although there is evidence to

support it, the reviewing court is left with a definite and firm conviction that the circuit court has made a mistake. *Id*. In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Fletcher v. Stewart*, 2015 Ark. App. 105, 456 S.W.3d 378.

Charles claims that it was "undisputed" that the mediation agreement "fully addressed" the parties' real estate. He states that as part of the agreement, the parties had agreed that the real estate would sell for no less than $200,000, but under the court's order, there is no minimum bid for the real estate at a commissioner's sale, so it will operate as a loss to both parties.

Charles does not dispute or even address the fact that the agreement was not entered into evidence at the hearing. The only evidence before the circuit court was testimony from Deborah referring to two pieces of property (a "lakefront" property and the Avoca property) and a colloquy wherein counsel appeared to be confused about whether the mediation agreement covered two or four parcels of real estate. We hold that the circuit court did not clearly err in disregarding an agreement that was not entered into evidence and that had unclear terms based on the evidence presented at the hearing.

IV. *Contempt*

In order to establish contempt, there must be willful disobedience of a valid order of a court. S*ee Ivy v. Keith*, 351 Ark. 269, 279, 92 S.W.3d 671, 677 (2002). Contempt is a matter between the court and the litigant and not between the two opposing litigants. *Id*. Before one can be held in contempt for violating the court's order, the order

must be definite in its terms, clear as to what duties it imposes, and express in its commands. *Id.*

Civil contempt protects the rights of private parties by compelling compliance with orders of the court made for the benefit of private parties. *Omni Holding & Dev. Corp. v. 3D.S.A., Inc.*, 356 Ark. 440, 448, 156 S.W.3d 228, 234 (2004). The standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Id.* at 449, 156 S.W.3d at 235.

Charles first asserts that the circuit court erred in finding him in contempt for nonpayment of previously ordered child support. In a temporary ex parte order entered on January 25, 2018, the circuit court ordered Charles to pay $199 a week in child support and set a hearing for February 7. The record reflects that no hearing was held on that date. Deborah filed a motion for contempt for nonpayment of child support on June 30. In Charles's response, he alleged that he was not served with the temporary order awarding child support and that his income was not sufficient for him to pay the amount ordered; he also asserted the defenses of estoppel, laches, release, and waiver.

According to Charles's testimony at that hearing, he was made aware of the child-support obligation sometime in April. Deborah testified that she "thought" he was served, but no definitive proof of service was introduced. Charles testified that he paid Deborah $500 in child support in February, March, May, June, and July; $600 in September and October; $800 in August; and $0 in April and November. When asked why he should not be held in contempt for nonpayment, Charles answered, "I've got zero money in my wallet. . . . $2,000 a month doesn't go very far when Debbie's averaging over 600 . . . dollars in support."

11

In the divorce decree entered January 22, 2019, the circuit court found Charles in contempt for failure to pay child support and that he owed $3,500 in arrearages. As a sanction, the court ordered him to pay $935 to Deborah within sixty days of the order and to pay $160 a month in addition to his child-support obligation of $800 a month until his arrearage was paid. The decree does not contain a ruling on notice.

On appeal, Charles argues that the circuit court erred because he had not "willfully" failed to pay child support from the time the temporary order was entered in January to when he was made aware of the order in April. He also asserts that considering his actual income, not the income imputed by the court, he cannot afford to pay that sum of child support and that his payments had averaged over $600 a month, which is consistent with what his child-support obligation would be based on his income of $500 a week.

Because we affirm the imputed-income amount, we also affirm the court's finding of contempt for nonpayment of child support, especially since the circuit court did consider the amounts that Charles has paid in determining the arrearage amount. The circuit court's decision was not clearly against the preponderance of the evidence.

Second, Charles argues that the circuit court erred in finding him in contempt for failing to pay alimony as ordered. The contempt order was filed on June 5, 2019, making a notice of appeal from that order due on July 5; Charles did not file an amended notice of appeal to include this order until July 8. Pursuant to Ark. R. App. P.–Civ. 4(a) (2019), "a notice of appeal shall be filed within thirty (30) days from the entry of the judgment, decree or order appealed from." The failure to file a timely notice of appeal deprives the appellate court of jurisdiction. *See Harold Ives Trucking Co. v. Pro Transp., Inc.*, 341 Ark. 735, 19 S.W.3d 600 (2000). Thus, we hold that this argument is not properly before us.

Affirmed.

ABRAMSON, KLAPPENBACH, WHITEAKER, VAUGHT, and BROWN, JJ., agree.

VIRDEN, HARRISON, and HIXSON, JJ., dissent.

**BRANDON J. HARRISON, Judge, dissenting**. I respectfully dissent from the majority's decision to affirm the alimony award in favor of Deborah; an award that only our deferential standard of review permits her to keep in any amount.

As the majority has observed, the circuit court imputed $3,400 in monthly income to Charles. From that sum the court awarded $800 a month in child support to Deborah and required Charles to pay another $2,000 per month in alimony to her.

Do the math: $3,400 – $800 – $2,000 = $600. Six hundred dollars. That's what the majority holds to be a reasonable sum to allow Charles to live on. Of course, it isn't. So says the Federal Poverty Level. According to that metric, for two years Charles must live on a mere fifty-six percent of the amount at which it deems an individual to be poverty stricken. *See* www.healthcare.gov (FPL for an individual in 2020 is $12,760) (last visited 6 September 2020). No wonder Charles lives, as a matter of undisputed fact, "in a trailer with no electricity or running water[.]"

Deborah, however, will live in comparative luxury. With her $33,600 annual award, she won't come too close to the poverty line that Charles will long cross, not even if we include all three of the former couple's children in Deborah's household. *See id.* (FPL for a family of four is $26,200).[1]

---

[1]Three children were born of the marriage. Though it's possible that two are of majority age by now, I have included them all in Deborah's household to make a point.

Pause and let these facts seep in. Deborah—a healthy person with an experienced and varied work history across multiple ventures with her husband Charles—is "assured" an income of $33,600 per year from Charles alone, while he is left with a mere $7,200 per year. This doesn't even consider the point that there is no operable truck with which to conduct the trucking business needed for Charles to pay his ordered support payments.[2]

★ ★ ★

The circuit court was presented with an unusual case that was destined for an outcome in which no party would find full satisfaction. Still, given the entire record, I would hold that the circuit court abused its discretion in setting the alimony amount it did. Consequently, the alimony award should be reversed, and the case remanded for a reasonable amount to be set. Any finding of contempt for failing to pay the unreasonable alimony amount should be reversed, too.

VIRDEN and HIXSON, JJ., agree.

*Kezhaya Law PLC*, by: *Matthew A. Kezhaya*, *Josie N. Graves*, and *Sonia A. Kezhaya*, for appellant.

One brief only.

---

[2]Deborah said this on cross-examination: "The inspection list I received when I picked up the truck showed that the truck is not legal to be on the road."

14