Cite as 2021 Ark. App. 42

# ARKANSAS COURT OF APPEALS

DIVISION I

**No.** CV-20-235

| | |
|---|---|
| JESSICA CHANDLER<br><br>APPELLANT<br><br>V.<br><br>SHAE CHANDLER<br><br>APPELLEE | **Opinion Delivered:** February 3, 2021<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTEENTH DIVISION [NO. 60DR-17-1477]<br><br>HONORABLE MACKIE M. PIERCE, JUDGE<br><br>AFFIRMED IN PART; DISMISSED IN PART |

## BART F. VIRDEN, Judge

After approximately ten years of marriage, Jessica and Shae Chandler were divorced by order of the Pulaski County Circuit Court entered August 14, 2019. Jessica appeals the circuit court's decisions regarding custody of their minor children, EC (born 2009) and VC (born 2012), the parties' responsibility for the cost of private education for VC, the allotment of all interest in the marital business to Shae, spousal support, and the amount of the attorney's-fees award. We affirm in part and dismiss in part.

## I. *Relevant Facts*

On April 14, 2017, Jessica filed a complaint for divorce requesting spousal support, child support, and primary custody of EC and VC subject to Shae's visitation.[1] Shae

---

[1]Jessica did not plead grounds in her complaint; however, the court allowed her to orally amend her complaint later. Shae did not object, and it is not an issue on appeal.

counterclaimed for divorce requesting primary custody and child support. Also, Shae contended that Jessica removed $2,250 from one of his accounts without his consent and sought reimbursement.

Jessica submitted an affidavit of financial means, setting forth that she receives $400 a month in dividends from a Stephens account; $631 in temporary child support; $250 in "Stephens Withdrawals"; and she owns $180,000 in stocks, bonds or mutual funds. The affidavit provides that her monthly expenses total $10,472.61 and that she has $100,000 in student-loan debt from attending one year of medical school. The affidavit provides that school expenses for both children are $23,469.68 a year. The children's monthly medical expenses are $2,618.30. In his affidavit of financial means, Shae listed his yearly net income as $35,902, and he stated that he had $4,000 in a retirement account. He stated that his monthly expenses are $2,323 and that he is $46,004 in debt.

On February 12 and May 22, 2019, the court held hearings on the matter. Originally, the second hearing was scheduled for May 9. Shae, his counsel, and his witnesses appeared before the court; however, Jessica and her witnesses did not. Counsel for Jessica explained that she had a panic attack that morning and could not attend the hearing. The court rescheduled the hearing for May 22. The testimony offered at both the February and May hearings involves the same subject matter, and all relevant testimony is summarized here. Jessica testified that since the separation, she had used her inheritance to pay for expenses, and she had cashed out her money-market account. Before the parties separated, Jessica was the secretary and treasurer for the marital business, Modern Lawns. Jessica testified that between 2014 and 2016, she used around $15,000 from her separate accounts to pay the

bills for, and invest in, Modern Lawns, describing those examples as a "snapshot" of the money she had invested in the business. Jessica estimated that Modern Lawns' value is around $250,000 because she estimated that the equipment is worth that amount, though she does not know what the price of the equipment was at the time of purchase. Before the separation, Jessica used a Capital One card for household and business expenses, and after the separation, she used it for household expenses only. Jessica explained that Shae funded the Capital One card and occasionally cut off her use of the card. Jessica stated that her mother died in 2006 and left her the Stephens account. The parties agreed that the family's home on "H" Street was purchased before she and Shae married, is her sole property, and she carries no debt on the house. Jessica pays $300 each month for homeowner's insurance and maintenance, and she testified that the house needs repairs, particularly in the kitchen, and that the condition of the kitchen adds to the expense of dining out. Jessica testified that she made an insurance claim on the kitchen damage and, in May 2018, received a check for $13,000.

Shae testified that he started the Modern Lawns business in 1989 or 1990 and built his business by word of mouth. He stated that he did not have a high school diploma or GED and that Jessica has a degree in reticular biology and attended one year of medical school. Shae testified that he had a significant amount of debt, including tax debt. Shae agreed with Jessica's statement that before the parties separated, she used money from her Stephens account for the business. He also explained that Jessica was cut off from using the Capital One card when she went over the limit and that she used the card to buy cigarettes, drinks, and other nonhousehold items. Shae requested that the court award joint custody,

3

with each parent having the children for a week at a time.

Wyatt Reid Smith testified that he had been Shae's accountant since 2017 when the parties separated. He explained that when he took over the accounting for Modern Lawns, "they were three or four years behind on tax returns, cash activity had not been included, credit card activity hadn't been included and payroll hadn't been recorded or paid." Smith stated that Modern Lawns' total income for 2018 was $299,723. After advertising, vehicle maintenance, fuel expenses, computer-software subscription, insurance for vehicles, workers' compensation, general liability, health insurance, client entertainment expenses, parts and materials, and payroll were deducted, the net income for Modern Lawns was $32,922. Smith explained that a generous estimate of the expenses, around $5,000, were attributable to Shae's personal expenses. Smith estimated that the business's assets were worth between $32,000 and $35,000, and the credit card debt was $38,000. Smith explained that Shae had just lost a big client who paid a flat monthly fee of $2,400, or about $30,000 a year. Smith opined that "Modern Lawns is in a pretty dire situation, at the moment, given the last year" and that he estimated the value of the business as "zero." At the February hearing, Smith testified that it was a slow time for the business and that Shae had not paid himself his usual income of $554.10 a week.

The parties offered testimony regarding VC's educational needs. Jessica testified that both children attend Holy Souls School, and she recently decided to transfer VC to the Hannah School, which offers specialized dyslexia intervention. Jessica contended that VC would not receive the same level of intervention at a public school. Jessica explained that VC had been diagnosed with severe dyslexia at the end of kindergarten, and to advance to

4

first grade, he must attend dyslexia intervention three times a week at a cost of $62 each session. Jessica explained that EC has dysgraphia and that she benefits from private-school education and intervention as well. Jessica stated that she and Shae agreed that if he "took care of me, I would pay the children's tuition." Jessica asserted that Shae "has agreed to pay for Holy Souls because he has already paid me half the very first time he left us. I have paid the tuition the past year." Jessica requested that the circuit court order Shae to pay for half of the private-school costs for both children. Jessica expressed doubt that Shae was reporting all Modern Lawns jobs and income, specifically recounting that she saw him working at a big job site in April 2018 and had seen no invoices from that job; thus, Jessica stated that she believes that Shae is able to pay for private school.

Shae's testimony differed from Jessica's. Shae testified that Jessica's grandparents had set aside money for the children's education, and there was $208,000 in the account according to the affidavit of financial means. Moreover, Shae testified that he had never paid for the children's private education, he was not financially able to do so, and he supported the children attending public school. Shae also stated that he had no objection to VC attending the Hannah School, but he could not pay for it.

Jessica requested primary custody, testifying that she is and always has been the children's primary caregiver and "knew every single in and out of their life." She contended that Shae primarily focused on work and that Shae "doesn't know their schedules, their medicines, their doctors, and when things are due." She explained that Shae is lax in helping the children do their homework, and he does not regularly attend school parties. According to Jessica, Shae does not take the children's allergies seriously or give the children their

5

allergy medicine when they are with him. Jessica testified that Shae has failed to attend Girl Scout and Boy Scout events, including failing to pick up Girl Scout cookies and not attending a Boy Scout camp out with VC. Jessica stated that when Shae works late, he drops the children off at his mother's house. Jessica contended that Shae's relationship with EC is strained and that EC attends counseling. She explained that Shae shows a preference for VC. Shae exercised visitation; however, EC was uncomfortable at his house, and Shae often brings EC back to her house. Jessica recounted several specific incidents since the separation when Shae was very intoxicated in front of the children, including an incident a few weeks before the trial. Jessica asserted that she and Shae do not communicate well and that Shae eliminated the family calendar to prevent her from making appointments on his time or during his weekends. Jessica's father, Floyd Raney, testified that both parties are good parents. Raney testified that Shae helped with the children before the separation and that if Shae was not working, he was with the kids.

Shae's testimony regarding his parenting and relationship with the children differed from Jessica's. Shae explained that if he did what Jessica wanted him to do then everything was fine; otherwise, she disparaged him to the children and refused to let him see them. Shae testified that he is a "hands on" father and that he helps them get dressed, makes lunches, walks them to school, and plays with them after work. Shae agreed with Jessica that when EC asks to go home, he does not make her stay with him and brings her home. He explained, "I have difficulties with EC, and if she wants to home, I let her go home to her mother." Shae also testified that EC is "emotional and, in my eyes, a bit spoiled." He explained that when he picks EC up for weekend visitation she is "non-receptive and angry

6

and bitter" but that by the time the weekend is over, "she's happy and in good manners, kisses me goodbye and tells me that she loves me." Shae stated that he was agreeable to family counseling and willing to attend counseling till the final divorce hearing. Shae also explained that he had, as Jessica testified, decided not to chaperone VC on a Boy Scout event at the last minute because it had been raining for several days and was storming the day of the camp out. As to Jessica's testimony that he was intoxicated around the children, Shae stated, "Other than the incidents Jessica related that occurred in 2018, there have not been any concerns about my alcohol intake."

The circuit court entered the divorce decree on August 14, 2019. In pertinent part, the court awarded joint custody of the children and decided that neither party would pay child support. The court denied Jessica's request for spousal support. The court determined that the children could continue in private school if Jessica chose to pay the costs and fees. If she did not pay the expense of private education, the children would be enrolled in public school. The court ordered the parents to cooperate, not disparage the other parent to the children or use the children as messengers, and administer medication as directed. The court further ordered that neither party would abuse alcohol when the children were in their care. The parties were ordered to reimburse each other for half of any health-related expenses that were not covered by insurance, including VC's therapy and tutoring related to dyslexia. The court found that Modern Lawns was jointly owned, its value was "nominal," and that any value going forward is attributable primarily to Shae's labor. The court awarded Shae sole ownership and found that Jessica was not entitled to payment for any interest. The court found that each party was responsible for his or her attorney's fees, except that Shae

could file a fee petition regarding the May 9 hearing that Jessica did not attend.

On August 29, Shae filed a petition for attorney's fees. Shae explained that although Jessica had participated in all preceding points of the case, she chose not to appear for the May 9 hearing, causing him to incur additional costs and fees of $6,705. Shae stated that Jessica claimed to have had an "anxiety issue" on the day of the hearing but did not offer any evidence of such. On October 28, a hearing was held on the matter. Jessica argued that the only cost accountable to her absence on May 9 is $2,700 for the expert witness, who had to appear a second time. She also asserted that $2,000 for trial preparation was excessive because the necessary preparation had taken place before the original hearing date. The circuit court awarded Shae $4,000 in costs and fees, finding that Jessica "failed to appear for the May 9, 2019 final hearing causing the Defendant to incur attorney's fees and expert witness costs."

Jessica timely filed her notice of appeal from the divorce decree.

II. *Discussion*

A. Custody

For her first point on appeal, Jessica argues that the circuit court's decision to grant joint custody is erroneous because she is and has been the children's primary caregiver. Jessica contends that Shae is more focused on his business than the children and is in other ways inattentive to the children's needs and that he has an ongoing drinking problem. Also, Jessica asserts that Shae is unable "to cooperate with regard to shared decisions in matters affecting the children[.]" Her arguments are not persuasive.

In domestic-relations cases, our review is de novo, but we will not reverse the circuit

court's findings of fact unless they are clearly erroneous. *Dare v. Frost*, 2018 Ark. 83, 540 S.W.3d 281. When in the child's best interest, custody should be awarded in such a way as to ensure the frequent and continuing contact of the child with both parents. *Cunningham v. Cunningham*, 2019 Ark. App. 416, at 5, 588 S.W.3d 38, 41. In 2019, the General Assembly amended Arkansas Code Annotated section 9-13-101 to announce that an award of joint custody is "favored" in Arkansas. Act of Apr. 11, 2019, No. 906, 2019 Ark. Acts 5480. In *Pace v. Pace*, 2020 Ark. 108, at 10, 595 S.W.3d 347, 352, our supreme court held that "[t]his change in the law is profound; the parties were no longer obligated to maintain a careful balance of cooperation to stave off a judicial dissolution of a joint-custody arrangement." Previously, case law held that joint custody was not favored unless circumstances clearly warrant such action. *See Gray v. Gray*, 96 Ark. App. 155, 239 S.W.3d 26 (2006). The fact that one parent is the primary caretaker of the child during the marriage is not in and of itself determinative, although relevant and worthy of consideration. *Black v. Black*, 2015 Ark. App. 153, 456 S.W.3d 773. Each child-custody determination ultimately must rest on its own facts. *Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297.

Jessica disagrees with the court's findings of fact regarding the court's joint custody decision. Though she testified that she was and is the primary caregiver, Shae asserts that he is a "hands on" father, and even Jessica's father testified that Shae is a good father who spends his time with his kids when he was not working. Both parties testified that Shae exercises visitation, and he has family support when his seasonal business requires him to work long hours. The parties' testimony about Shae's drinking also differs. Jessica recounted multiple instances when Shae was drunk around the children, but Shae testified that he drank around

9

his children "a couple of times in 2018 but that it had not been a problem since." Jessica asks this court to reweigh the conflicting evidence given at trial and find differently than the circuit court regarding the appropriateness of joint custody; however, we find no error in the circuit court's determination.

Jessica's argument that the parties cannot cooperate is also not well-taken. As for the conflict between the parties, in a recent case, our court affirmed a joint-custody award despite the appellant's argument that the parties had parted in hostility with no trust between them. *Grimsley v. Drewyor*, 2019 Ark. App. 218, 575 S.W.3d 636. In *Grimsley*, we stated that "[m]ost joint-custody situations involve some amount of disagreement." *Id*. at 10, 575 S.W.3d at 642. Accordingly, we hold that the circuit court did not clearly err in awarding joint custody under the facts of this case in which the discord between the parties is far less than in *Grimsley*.

After conducting our de novo review of the record, we are not left with a definite and firm conviction that the court erred.

### B. Cost of Private Education for VC

Jessica asserts that the circuit court erred by deciding that she should bear the full costs of special-education services for VC. Jessica argues it is necessary to enroll VC in the Hannah School to treat his dyslexia, and the cost of private school should be considered a medical expense not covered by insurance. Jessica asserts that the Hannah School offers "specialized tutoring"—an expense the court ordered the parties to split—and that VC "would not survive in public school." We disagree with Jessica's interpretation of the circuit court's order.

10

The court clearly differentiated private-school education from medical expenses, finding that Shae

> will continue to provide health insurance for the children with the parties dividing equally any non-covered medical expense incurred, which includes but is not limited to health, vision, dental, orthodontic, mental health or *therapy/tutoring related to VC's diagnosed learning disability*.

(Emphasis added.) Likewise, Jessica's assertion that private school is the same as "specialized tutoring" is not persuasive. The court's order provided that the cost of VC's therapy and tutoring related to his dyslexia is both parties' responsibility, and a separate expense unrelated to private school.

Jessica further argues that the court's finding that VC attends a specialized private school to address his specific educational needs directly conflicts with the court's order to enroll VC in public school if she does not pay the tuition for this school. Our court will not reverse the circuit court's findings of fact unless they are clearly erroneous. *See Dare v. Frost*, 2018 Ark. 83, 540 S.W.3d 281. The circuit court's finding of fact—that VC attends private school—does not conflict with the order to enroll VC in public school if Jessica chooses not to continue paying for private school.

## C. Interest in Business

For her third point on appeal, Jessica argues that the circuit court's failure to award any interest in the marital business was clearly erroneous, or if the circuit court chose to divide the marital property unequally, it erred by not stating its reasons for doing so. Jessica also asserts that the court erred in finding that the value of the business is "nominal." We disagree.

With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous or against the preponderance of the evidence. *Gray v. Gray*, 352 Ark. 443, 454, 101 S.W.3d 816, 821 (2003). A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Conlee v. Conlee*, 370 Ark. 89, 257 S.W.3d 543. To demonstrate that the circuit court's ruling was erroneous, an appellant must show that the circuit court abused its discretion by making a decision that was arbitrary or groundless. *Id.*

Arkansas Code Annotated 9-12-315(a)(4) (Repl. 2015) requires that the court determine the value of the business venture and may order that the securities be distributed to one party on condition that one-half the value of the venture in money or other property be set aside and distributed to the other party in lieu of division. Here, the circuit court determined that

> [t]he parties jointly own a business known as Modern Lawns. [Shae] formerly worked in the business and requests that the business interest be split. [Shae] has requested that he be awarded all interest in the business. Considering the testimony and evidence offered regarding the present value of the business, the Court finds that the value, if any, is nominal and any value going forward is attributable primarily to [Shae's] labor. As such, [Shae] is awarded sole ownership of Modern Lawns. [Jessica] is not entitled to payment for any interest in the business.

The court heard conflicting testimony regarding the value and assets of the business and the accuracy of the account books. Jessica offered testimony that she had helped build the business, and she believed Modern Lawns was more valuable than Smith and Shae stated; however, Shae and his accountant testified that the business was in debt and struggling. We give due deference to the circuit court's superior position to determine the credibility of

12

witnesses and the weight to be given their testimony, and given the testimony, we cannot say that the court's findings regarding the value of the business are arbitrary or groundless. *Conlee, supra*. Additionally, the court complied with the statutory requirement that it either designate the specific property to which each party is entitled or award all interest to one party and distribute half the value of the business in money or other property. Ark. Code Ann. § 9-12-315(a)(4). Here, the entire business interest was awarded to Shae, and the court found that Jessica was not entitled to distribution of half the value simply because there was none. We find no clear error in the circuit court's findings regarding the value and distribution of Modern Lawns.

## D. Spousal Support

Jessica argues that the circuit court clearly erred when it denied her request for spousal support. Specifically, Jessica argues that the court should have weighed other factors such as the past standard of living, the length of the marriage, and the division of the business property more heavily. Also, Jessica asserts that she has an additional need for alimony because VC's dyslexia intervention requires "special educational arrangements that cost money. A cost that the trial court failed to require Appellee to pay half of." We disagree.

The purpose of alimony is to rectify the economic imbalance in earning power and standard of living of the parties to a divorce in light of the particular facts of each case. *Burns v. Burns*, 2011 Ark. App. 312, 383 S.W.3d 458. In fixing the amount of alimony to be awarded, the circuit court is given great discretion, and the appellate courts will not disturb the award on appeal unless there is an abuse of that discretion. *Id*. The primary factors to be considered in making or changing an award of alimony are the need of one spouse and the

ability of the other spouse to pay. *Id.* Secondary factors to be considered by the circuit court include (1) the financial circumstances of both parties; (2) the amount and nature of the income, both current and anticipated, of both parties; (3) the extent and nature of the resources and assets of both parties; and (4) the earning ability and capacity of both parties. *Id.* The amount of alimony awarded should not be reduced to a "mathematical formula" because the need for flexibility outweighs the need for relative certainty. *Id.*

Here, the court denied Jessica's request for spousal supporting, finding that

[g]iven [Jessica's] educational background and ability to engage in meaningful employment as well as [Shae's] earning capacity with Modern Lawns as established by the evidence presented, the Court finds that [Jessica] does not have a need nor does [Shae] have an ability to play.

The court considered the primary factors—Jessica's need for alimony and Shae's ability to pay—as well as secondary factors including the parties' earning capacity, Jessica's educational background, and her ability to gain employment; thus, the circuit court did not act thoughtlessly, improvidently, or without due consideration in deciding the matter of spousal support. As Jessica points out, her assets are "her home and her inheritance from her mother" as opposed to Shae's business, which he and his accountant testified is failing. Jessica disputes the testimony regarding the value of Modern Lawns and Shae's financial situation; however, as we stated above, we defer to the circuit court's superior position to judge the credibility of the witnesses. *Trucks v. Trucks*, 2015 Ark. App. 189, 459 S.W.3d 312.[2] In light

---

[2]Regarding Jessica's argument that she bears the cost VC's dyslexia intervention, we held above that this is not true. Though the circuit court refused to order the parents to split the cost of private school, it specifically ordered the parents to split the cost of tutoring or treatment associated with VC's dyslexia.

of the broad discretion vested in the circuit court, we hold that the circuit court did not clearly err in denying Jessica's request for spousal support.

## E. Attorney's Fees

Jessica argues for her fifth point on appeal that the circuit court's $4,000 award in attorney's fees to Shae is excessive. We cannot reach Jessica's argument on this point. Though her notice of appeal from the August 19 divorce decree was timely filed, she failed to file a notice of appeal regarding the December 3 order awarding fees. An attorney-fee order must appear in the notice of appeal if we are to have jurisdiction to review the order. *Taylor v. City of Fort Smith*, 2014 Ark. App. 450, 441 S.W.3d 36. This portion of Jessica's appeal is therefore dismissed.

Affirmed in part; dismissed in part.

ABRAMSON and HIXSON, JJ., agree.

*Lea Ellen Fowler*, for appellant.

*LaCerra, Dickson, Hoover & Rogers, PLLC*, by: *Lauren White Hoover* and *Marjorie E. Rogers*, for appellee.