Cite as 2021 Ark. App. 87

# ARKANSAS COURT OF APPEALS
DIVISION IV
**No.** CV-20-72

| | |
|---|---|
| KIMBERLY TOWNSEND<br><div align="right">APPELLANT</div> | **Opinion Delivered:** February 24, 2021 |
| | APPEAL FROM THE LONOKE COUNTY CIRCUIT COURT [NO. 43DR-18-46] |
| V. | |
| | HONORABLE JASON ASHLEY PARKER, JUDGE |
| JAMES TOWNSEND<br><div align="right">APPELLEE</div> | AFFIRMED |

## PHILLIP T. WHITEAKER, Judge

Appellant Kimberly Townsend ("Kim") appeals from the divorce decree entered by the Lonoke County Circuit Court. On appeal, Kim raises three challenges to the decree, assigning error to (1) the court's award of child support; (2) the court's unequal division of marital property; and (3) the court's refusal to award her alimony. Finding no error, we affirm.

## I. *Background*

Kim and appellee James Townsend were married in 2003. During their fifteen-year marriage, they had two children, M.T. and J.T.; acquired property; and incurred a significant amount of debt. Throughout their marriage, James was the primary source of income while Kim was the stay-at-home care provider. In 2018, the parties separated. After the separation, James stayed in the marital home while Kim moved in with her sister.

James filed for divorce, and Kim answered and counterclaimed. During the litigation, the parties disagreed strongly on the issues of custody, visitation, child support, alimony, property allocation, and the payment of bills. Both parties presented extensive testimony about their respective financial situations, their debt, and their marital property. On October 24, 2019, the court entered a final divorce decree awarding James and Kim shared joint legal custody of the children with Kim having primary physical custody and setting forth a detailed visitation schedule for James.[1] The court ordered James to pay $175 biweekly in child support with that amount rising to $325 biweekly in March 2000. The court acknowledged in its decree that both amounts (i.e., $175 and $325) were a downward departure from the family-support chart. Regarding marital property and debt, the court implemented an unequal division of the property in order to address the couple's large outstanding debt. And finally, the court denied Kim's request for alimony. Kim filed a timely notice of appeal challenging the court's findings on child support, the division of marital property, and alimony.

II.  *Discussion*

A.  Child Support

In her first point on appeal, Kim attacks the court's rulings concerning child support. Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous.

---

[1]While much of the testimony at the divorce hearing centered on the issues of custody and visitation, Kim raises no challenge to these issues on appeal. We therefore do not set forth the evidence nor conduct any analysis of these issues in this opinion.

*Hall v. Hall*, 2013 Ark. 330, 429 S.W.3d 219. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* As a rule, when the amount of child support is at issue, we will not reverse the circuit court's order absent an abuse of discretion. *Symanietz v. Symanietz*, 2020 Ark. App. 394, 609 S.W.3d 643. However, a circuit court's conclusion of law is given no deference on appeal. *Id.*

Under Arkansas's child-support statutes, when a decree of divorce is entered, a circuit court shall make an order concerning the care of the children as is reasonable from the circumstances of the parties and the nature of the case. Ark. Code Ann. § 9-12-312(a)(1) (Supp. 2019). In determining a reasonable amount of child support, the court shall refer to the most recent revision of the family-support chart. Ark. Code Ann. § 9-12-312(a)(3)(A). That chart, in turn, is set forth in Arkansas Supreme Court Administrative Order No. 10 (2020).[2]

Pursuant to the chart, a court must determine in its order the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the family-support chart. *See Deline v. Deline*, 2019 Ark. App. 562, at 14, 591 S.W.3d 365, 374. There is a rebuttable presumption that the amount of child support calculated pursuant to the most recent version of the chart is the amount of support to be awarded in a divorce proceeding.

---

[2]The family-support chart was dramatically amended by Act 907 of 2019; however, those modifications are not applicable here.

Here, the court determined that James earned a net biweekly income of $2,777 and that the presumptive child support per the family-support chart is $588 biweekly. However, the court set the support at a rate lower than the presumptive chart amount. In order to rebut the presumption described above, the court must enter a written finding that the amount calculated pursuant to the chart is "unjust or inappropriate." *See* Ark. Sup. Ct. Admin. Order No. 10(I); *see also Newton v. Newton*, 2018 Ark. App. 525, at 8, 565 S.W.3d 493, 499. If the court order varies from the guidelines, it shall include a justification of why the order varies as may be permitted under section V of Administrative Order No. 10.

Section V of Administrative Order No. 10 sets forth the factors for determining when a deviation from the chart may be appropriate. They include (1) food, (2) shelter and utilities, (3) clothing, (4) medical expenses, (5) educational expenses, (6) dental expenses, (7) child care, (8) accustomed standard of living, (9) recreation, (10) insurance, (11) transportation expenses, and (12) other income or assets available to support the child from whatever source, including the income of the custodial parent. Ark. Sup. Ct. Admin. Order No. 10(V)(a). Additional factors may warrant adjustments to a child-support obligation; among others, the factors include extraordinary time spent with the noncustodial parent or shared or joint-custody arrangements. Ark. Sup. Ct. Admin. Order No. 10(V)(6).

Kim argues that the circuit court erred in its calculation of the amount of child support. Here, the circuit court's decree addressed the downward deviation of child support as follows:

> [A] downward deviation from [the] presumptive obligation is appropriate based upon [Kim's] lack of normal living expenses, the amount of time [James] spends with the children, the amount of the marital debt [James] must pay each month pursuant to this decree, the parties' respective 2018 tax liabilities and refunds, [Kim']s failure to

make the [car] payments during the pendency of this matter, and [Kim's] willful contempt. Accordingly, [James] shall continue to pay $175 bi-weekly in child support until his first pay period in March 2020, at which point he will begin paying $325 bi-weekly.

Kim argues that the circuit court's downward deviation from the family-support chart is not supported by the considerations enumerated in the decree. We disagree.

First, Kim challenges the court's consideration of her "lack of normal living expenses" in its deviation from the chart amount of child support. We begin by taking note that food, shelter, and utilities are relevant factors for consideration by the court pursuant to Administrative Order No. 10. Next, we turn to the evidence before the court regarding her "lack of normal living expenses."

Regarding her normal living expenses, Kim testified that she was living with her sister, who did not require her to pay rent. Despite her testimony that she was not required to pay rent, she reported over $350 in monthly utilities-based expenses in her affidavit of financial means (AFM). On further examination, she conceded that her sister did not require her to pay rent or expenses and that these claimed expenses were not necessarily set in stone each month. She explained, however, that she was paying those things "out of the goodness of her heart." Despite not being required to pay her sister for her living expenses, Kim testified that she did not feel her sister would kick her out if she didn't pay her. Kim's sister corroborated that Kim and her children lived with her in her five-bedroom house, and she agreed that Kim and the children could stay with her "as long as they need to."

Additionally, Kim contends that *at the time of the separation*, she was working only eight hours a week and making only $3000 a year. While this contention was true with respect to this snapshot of her employment history, the court heard other evidence to the

contrary. At the time of the final hearing, Kim was working a full-time job. Kim testified that she was employed by Walgreen's and earning between $550 and $600 biweekly. In her own AFM, she indicated that her net pay was $561 biweekly, but paycheck stubs from her employer dated between January and February 2019 reflected biweekly take-home pay that ranged between $621.82 and $659.27. In fact, on cross-examination, Kim agreed that she and her employer had been talking about her taking a management position that would come with a two-dollar-an-hour raise. As noted above, in reviewing a circuit court's findings regarding child support, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Hardy v. Wilbourne*, 370 Ark. 359, 259 S.W.3d 405 (2007); *McGee v. McGee*, 100 Ark. App. 1, 262 S.W.3d 622 (2007). We therefore conclude that the circuit court gave proper consideration to Kim's living expenses as those factors are outlined in the family-support chart.

Next, Kim argues that the court wrongly considered the amount of time James would spend with the children under their custody and visitation agreement. *See* Ark. Sup. Ct. Admin. Order No. 10(V)(b)(6). The parties hammered out a very detailed custody arrangement under which James had alternate weekend visitation from Thursday evening through Monday morning (as opposed to the "standard" weekend visitation of Friday evening through Sunday evening); additional school holidays that coincided with federal holidays that James had off; and alternating weekly visitation during summers. These additional days constituted a not insubstantial amount of time; therefore, we cannot say that

the circuit court's consideration of the additional time James spent with the children was clearly erroneous or not in accordance with section (V)(b)(6).

Kim's third challenge is to the court's consideration of the amount of marital debt that James was required to pay under the decree. The court heard extensive evidence concerning a large amount of debt accrued during the marriage. Kim acknowledges that the total amount of debt assigned to James was $344,925.78, while she was obligated to pay only $9550.65. She argues, however, that "considering the drastic difference in the parties' income, this should not be reason to reduce the amount of child support." She cites no convincing authority in support of this argument, however. *See Boyd v. Crocker*, 2017 Ark. App. 108, 513 S.W.3d 302. The amount of child support a circuit court awards lies within its sound discretion and will not be disturbed on appeal absent an abuse of that discretion. *Williams v. Williams*, 82 Ark. App. 294, 302, 108 S.W.3d 629, 633–34 (2003); *Pittman, supra*.

Finally, Kim challenges the circuit court's reliance on the parties' 2017 and 2018 tax liabilities and refunds,[3] her failure to make payments on the vehicle,[4] and her willful contempt for failure to comply with discovery. She argues that these are not proper factors for the circuit court to consider in applying the family-support chart. James concedes that these "may not be specific reasons listed in Section V" of the family-support chart but suggests that, even without consideration of these factors, the downward deviation did not

---

[3]Kim received a $5400 tax refund for tax year 2018.

[4]In a temporary order entered before the final divorce hearing, Kim was awarded possession of a vehicle and ordered to make payments on it. She conceded at the final hearing that she had not made the court-ordered payments, but she suggested she could either pay for the car or feed her children, and she chose to feed her children.

constitute reversible error. Given that the court's reliance on the appropriate factors, as discussed above, was not erroneous, we agree with James.

In sum, in determining the amount of child support to be paid under Administrative Order No. 10, a circuit court must determine the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the family-support chart. The circuit court's order here does each of those things, and it outlines the factors the court utilized in determining that a downward departure from the chart was appropriate. On the basis of our standard of review, we cannot say that the circuit court's decision regarding child support was clearly erroneous or that the amount awarded constituted an abuse of discretion.

## B. Division of Marital Property

Kim's second argument on appeal pertains to the circuit court's division of the couple's marital property. With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous or against the preponderance of the evidence. *Thomas v. Thomas*, 68 Ark. App. 196, 4 S.W.3d 517 (1999). A circuit court's finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Dial v. Dial*, 74 Ark. App. 30, 44 S.W.3d 768 (2001). In reviewing a circuit court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001).

8

Arkansas Code Annotated section 9-12-315 (Repl. 2015) governs the distribution of marital property. As a general rule, the court should distribute all marital property one-half to each party unless the court finds such a division to be inequitable. Ark. Code Ann. § 9-12-315(a)(1)(A). A circuit court, however, has broad powers to distribute property in order to achieve an equitable distribution. *Keathley*, 76 Ark. App. 150, 61 S.W.3d 219. The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Id*. The statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Baxley v. Baxley*, 86 Ark. App. 200, 167 S.W.3d 158 (2004). In reaching an equitable determination of property distribution, the court shall take into consideration the factors set forth in Arkansas Code Annotated section 9-12-315(a)(1)(A).[5] If an unequal distribution of property is awarded, the court must state within its order the basis and reasons for not dividing the property equally. Ark. Code Ann. § 9-12-315(a)(1)(B).

Here, the court heard from both parties concerning their respective incomes, their debt, and their property. James testified that he worked full time for the Veterans' Administration and had other annual income from another source. Despite these sources of

---

[5]The factors set forth in section 9-12-315(a)(1)(A) include the length of the marriage; the age, health, and station in life of the parties; the occupation of the parties; the amount and sources of income; any vocational skills; employability; the estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income; the contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and the federal income tax consequences of the court's division of property.

income, James had very few assets. He had $2,596.51 in his bank account and a thrift savings plan (TSP) retirement account that contained $18,840.93. He asked the court to allow him to keep his retirement savings and expressed a willingness to take on more of the marital debt if that were to happen. Kim also had a small retirement account that accrued during the marriage.

Concerning marital debt, James's monthly expenses were $6,877.15, and he had debts totaling $397,493.86,[6] the monthly payments on which came to $4,156.50. Comparing his income and his debts, James testified that he was not able to pay for all of the debts in his name every month, as his expenses and debt payments exceeded his income.

The court heard evidence that the parties owned a home in Ward, which was encumbered by a mortgage, but neither party presented the court with evidence of the home's value. James informed the court that he would like to sell the home in order to pay off some of his debt.

The parties acquired two vehicles during the marriage. At the temporary hearing, the court awarded a vehicle to each party and ordered that each would be responsible for any associated vehicle debt. Kim undisputedly did not make the car payments assigned to her, even though she still had it in her possession. When asked about the car, Kim said she did not want it and could not afford to pay for it. She further acknowledged that she was not paying the credit-card debt she listed on her AFM because she could not afford to do so.

---

[6]James's debts included $197,451.53 in student loans. Kim's total debts amounted to $9550.65.

In the decree, the circuit court explained that it was "implementing an unequal division of both property and debts in this matter." The court ordered the marital home sold with James to receive all net proceeds after payment of the associated debt. James and Kim were each awarded all funds in any checking or savings accounts in his or her own name, as well as their own respective retirement benefits. The court awarded James both cars and made him responsible for any associated debts. The court directed that each party should be solely responsible for the debt in his or her own name and awarded James Kim's wedding ring because he was responsible for paying the debt thereon.

Kim complains—again without citation to authority—that the circuit court did not properly apply the relevant factors. She complains that James "received almost everything," including the equity in the marital home, his retirement account, his pension, both cars, and "even Appellant's jewelry."[7] Kim further argues that she has minimal work experience and no other source of assets, while James has a retirement account and a pension. She concludes, "Despite the contributions and sacrifices that [she] made for the family, the trial court refused to even award her half of the marital property. In reality, if there was an unequal division of marital property [to be had], it should have been in [her] favor."

We disagree. When a circuit court makes an unequal division of property under section 9-12-315, it must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the circuit court's

---

[7]We note that Kim testified that she did not want the vehicle, and she agreed in her posttrial brief that she would return her wedding ring if James would agree to be responsible for the credit-card debt associated with it.

11

order. *See* Ark. Code Ann. § 9-12-315(a)(1)(B); *Nelson v. Nelson*, 2016 Ark. App. 416, at 9, 501 S.W.3d 875, 881–82. Here, the court expressly stated that it had considered the parties' respective earning capacities, the length of the marriage, and the amount of debt the parties had accumulated. Moreover, the court was blunt in its explanation of why it ordered an unequal division of the marital property and debts: "The parties have too much debt and not enough money, so there is no way to divide the property and debt that will result in both parties being solvent." We note that the court went on to assign James all the debt in his name, which, according to his AFM, totaled $397,493.86. Although Kim was awarded relatively fewer assets, she also escaped the lion's share of the debt.

Although a circuit court must consider the factors set forth in the statute and state its reasons for dividing properly unequally, it is not required to list each factor in its order or to weigh all the factors equally. *Bamburg v. Bamburg*, 2011 Ark. App. 546, 386 S.W.3d 31. Furthermore, the specific enumeration of the factors within the statute does not preclude a circuit court from considering other relevant factors when exclusion of other factors would lead to absurd results or deny the intent of the legislature to allow for the equitable division of property. *Brown v. Brown*, 373 Ark. 333, 284 S.W.3d 17 (2008). The statute requires the circuit court to explain its reasons for not dividing the marital property equally. *See Nelson*, 2016 Ark. App. 416, 501 S.W.3d 875. In this case, we conclude that the circuit court did so, and we affirm the court's unequal division of marital property.

## C. Alimony

Finally, Kim argues that the circuit court erred by failing to properly address the issue of alimony and by failing to award alimony. The decision to grant alimony lies within the

sound discretion of the circuit court and will not be reversed on appeal absent an abuse of discretion. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). A circuit court abuses its discretion when it exercises its discretion improvidently, thoughtlessly, or without due consideration. *Stuart v. Stuart*, 2012 Ark. App. 458, at 3, 422 S.W.3d 147, 150. The appropriateness of an alimony award is determined in light of the facts in each case, and the circuit court is in the best position to view the needs of the parties in connection with an alimony award. *Zimmerman v. Pope*, 2015 Ark. App. 499, 471 S.W.3d 646.

The purpose of alimony is to rectify the economic imbalance in earning power and standard of living of the parties to a divorce in light of the particular facts of each case. *Chandler v. Chandler*, 2021 Ark. App. 42, 616 S.W.3d 279. The primary factors to be considered in making or changing an award of alimony are the need of one spouse and the ability of the other spouse to pay. *Id.*

Here, Kim asked the circuit court to award her alimony of at least $500 a month. Admittedly, Kim presented evidence of her need for support. The circuit court, however, was straightforward in its alimony analysis: "The court denies [Kim's] request for alimony. [James] does not have the ability to pay alimony."[8] Thus, although Kim contends that the circuit court "failed to properly address the issue of alimony," the court plainly considered one of the primary factors in deciding whether or not to award alimony: James's inability to pay. While James's income was considerably higher than Kim's, the decree nonetheless imposed nearly $400,000 in debt on him. Moreover, although the decree did not expressly

---

[8]Kim conceded on cross-examination that she did not know "where the alimony is going to come from."

consider Kim's need, it is apparent from the record in this case that the parties' overwhelming debt was of great concern to the circuit court. In light of the facts of this case, we are unable to conclude that the circuit court's denial of Kim's request for alimony was an abuse of discretion.

Affirmed.

HARRISON, C.J., and MURPHY, J., agree.

*Richard E. Worsham*, for appellant.

*Eden Law Firm*, by: *Kimberly J. Eden*, for appellee.